(No. 6287. October 29, 1936.)

AARON CALL and SAMANTHA A. CALL, His Wife, Respondents, v. CITY OF BURLEY, a Municipal Corporation, Appellant.

[62 Pac. (2d) 101.]

Arthur C. Dunn and Merrill & Merrill, for Appellant.

S. T. Lowe, for Respondents.

AILSHIE, J.—October 14, 1934, Samantha A. Call, one of the respondents herein, and her son, Ben, were, in the day-time, traveling in their automobile down Third Street in the city of Burley. Ben was driving the car and Mrs. Call was sitting in the rear seat; they were returning some quilting frames to a Mrs. Matthews. They traveled along in an easterly direction (at the rate of 10 or 15 miles an hour) and were engaged in a controversy as to just where Mrs. Matthews lived. While attempting to determine this fact, they arrived

at the intersection of the alley with Third Street, between Elba and Malta Streets. The front wheels of the automobile, as claimed by respondents, dropped into an excavation or ditch constructed by appellant across Third Street; the alleged excavation was made by the city for the laying of a water pipe and the removal of a culvert. Respondent was thrown forward, striking and cutting her head. As the back wheels dropped into the ditch, respondent fell down onto the bottom of the car, injuring her back.

On stopping the automobile Ben helped his mother up onto the back seat and looked through the window to see what had caused the accident. He observed a ditch or trench extending across the road about 18 inches wide. There were no signs or other warning of the excavation. After delivering the quilting frames, Ben drove to the Call residence about three miles southeast of Burley. On arriving at her home Mrs. Call went to bed and suffered severe pains in her head, neck and at the base of her spine. She remained in bed substantially for the greater part of three months.

February 8, 1935, this action was brought to recover damages, amounting to the sum of $5,281, for injuries sustained by respondent and for medical and other expenses. The cause was tried to a jury and a verdict returned against appellant in the sum of $500. After entry of judgment on the verdict appellant moved for a new trial. The lower court sustained respondent's objection to the motion and later modified this order on motion of respondents. This appeal is from the judgment, the order made on the motion for new trial and the amended order.

Assignments of error 1, 4, 5, 6, 8 and 9 all involve the contention that the pleadings and evidence show such contributory negligence on the part of plaintiff, Samantha Call, and her son, who was driving the car, as is sufficient, as a matter of law, to bar recovery. Special complaint is made by appellant against the action of the court in overruling its motion for nonsuit. It is contended, under the rule applied in *Dale v. Jaeger*, 44 Ida. 576, 258 Pac. 1081, that:

"When the established facts and circumstances permit only one possible conclusion to be drawn by a reasonably prudent

man, it becomes a matter of law for the court's determination.''

The question, therefore, arises here: Does the testimony of the plaintiff, Samantha Call, and her son, who was driving the car, disclose such contributory negligence as will defeat a recovery, under the foregoing rule? Their testimony on the subject is as follows:

(Ben Call.)

''Q. Well, now, did you know at the time where Mrs. Matthews lived?

''A. I thought I did but Mother thought she knew a different place, and she was trying to show me where she thought it was.

''Q. How fast were you traveling as you were going down Third Street?

''A. I would judge between 10 and 15 miles an hour.

''Q. Are you familiar with Malta and Elba avenues?

''A. Yes, sir.

''Q. Now, as you got between Malta and Elba avenues what were you doing?

''A. I was looking to see where Mrs. Matthews lived.

''Q. And what happened?

''A. We dropped into this ditch.

''Q. Then what happened?

''A. I stopped just as soon as I could after I hit the ditch and turned around and helped Mother up from the bottom of the car, in the seat.

''Q. Did you observe the ditch?

''A. Just from the windows of the car.

''Q. Describe to the jury what you saw.

''A. Well, there was an open ditch just clear across the road.

''Q. Could you tell them approximately how wide it was?

''A. I would judge it was about a foot or foot and a half wide.

''Q. Where was Mrs. Matthews?

"A. I don't know.

"Q. Well, where was her place?

"A. It was just around the corner to the right.

. . . . . . . . . . . .

"Q. The street, as a matter of fact, was perfectly clear in front of you?

"A. Yes, sir.

"Q. You could see clear up the street?

"A. Yes, sir.

"Q. You could see anything in the street if you had been looking ahead?

"A. Yes, sir.

"Q. So when you came along the street here your mother was talking to you from the back seat?

"A. Yes, sir.

"Q. And she was trying to tell you where Lillie Matthews lived?

"A. Yes, sir.

"Q. And you weren't looking ahead?

"A. No, sir.

"Q. You weren't paying attention to the roadway up ahead of you, were you?

"A. Not just at that time.

. . . . . . . . . . . .

"Q. How far, then, after you left Elba street before you got to the alley did she commence talking to you?

"A. Between the corner and the alley.

. . . . . . . . . . . .

"Q. So you were looking around from then on until after the accident?

"A. Until we dropped in the hole, yes, sir.

. . . . . . . . . . . .

"Q. And do you mean to say, Mr. Call, you ran across this trench without having seen it at all?

"A. Yes, sir.

"Q. And that was because you were looking for somebody's house?

"A. Yes, sir.

"Q. And then after you crossed it you went about fifteen or twenty feet beyond before you stopped your car?

"A. Yes, sir.

"Q. Then you looked back?

"A. Yes, sir.

"Q. Out of the back window of the car, is that right?

"A. Yes, sir.

. . . . . . . . . . .

"Q. And from that distance, fifteen or twenty feet beyond, looking back out of a car window, you tell us you observed a trench that was about two feet across?

"A. Yes, sir.

. . . . . . . . . . .

"Q. When you looked up the street, before you say you hit this excavation, how far up could you see?

"A. I could see clear to the end of the road; the road was bare.

"Q. Nothing on the highway to obstruct your view?

"A. No, sir.

"Q. And it was broad daylight?

"A. Yes, sir.

"Q. And you didn't see any excavation?

"A. No, sir.

(Mrs. Call, Plaintiff.)

"Q. And what was your position, riding in the automobile?

"A. I was sitting in the back seat, leaning over talking to Ben.

. . . . . . . . . . .

"Q. Now, you were taking these quilting frames, I under-stand, back to Mrs. Matthews?

"A. Yes, sir.

"Q. Did you know where Mrs. Matthews lived at that time?

"A. No, sir, I wasn't certain.

"Q. Now, were you driving along Third street?

"A. Yes, sir.

"Q. Where did you turn onto Third street from the street you were first traveling?

"A. From the house we left there?

"Q. Yes.

"A. We turned on the old highway and went north to Normal, east to Normal, and then went north until we came to Third street.

"Q. Where with reference to the L. D. S. tabernacle did you turn into Third street?

"A. Right at the corner where the tabernacle stands.

"Q. Where did you first get in the car that morning?

"A. At my home.

"Q. Then before you picked up the quilting frames where did you first get in the car?

"A. At our home; Mr. Call, Ben and I went to Sunday school.

"Q. Then the boy picked you up at the home and brought you down?

"A. We were all at home, and came down to Sunday school.

. . . . . . . . . . . . . .

"Q. How were you seated on the back seat?

"A. I was sitting in the back seat leaning over talking to Ben.

"Q. While Ben was driving?

"A. Yes, sir.

"Q. That was during all the time you were going up Third street?

"A. I don't remember.

"Q. When did you start leaning over talking to Ben?

"A. We were talking all the way up there, visiting and going slowly.

"Q. You were talking to him and he talking to you?

"A. Yes, sir.

"Q. And you were driving all the way up the street that way, were you?

"A. I don't remember.

"Q. I am asking as a fact, were you?

"A. I think so.

"Q. Were you looking forward?

"A. Before we got to the home?

"Q. Yes.

"A. Yes, sir.

"Q. Did you see anything?

"A. Absolutely nothing.

"Q. Could you see the distance ahead of you all right?

"A. I think so.

"Q. Well, could you?

"A. Yes, sir.

"Q. Did you see any dirt on the ground?

"A. No, sir.

"Q. Didn't see a thing?

"A. Not a thing.

"Q. Were you looking ahead when the car went into the hole?

"A. I had drawn Ben's attention to the house, I said to him, 'Ben, Mrs. Matthews lives over here,' and he said, 'No, Mother, I think she lives here;' and I had drawn his attention from the wheel and we struck the hole.

"Q. So you had drawn his attention from the roadway and the wheel in front of you?

"A. I guess it did, I was talking to him telling him where the house was.

"Q. How far were you from the hole when you drew his attention from the roadway?

"A. I don't know, because I didn't know where the hole was.

"Q. Well, before the bump, then?

"A. I don't know.

"Q. Do you remember the streets that you passed, Mrs. Call?

"A. We went over Third Street; the hole, I think, is in the center, between Elba and Alma.

"Q. Is it not Elba and Malta?

"A. Yes, sir.

. . . . . . . . . . . . . . . .

"Q. Did he put on the brakes?

"A. I don't know.

"Q. How were you seated in the automobile at the particular time?

"A. I was sitting in the back seat leaning over talking to Ben.

"Q. Did you have your arms on the front seat?

"A. I don't remember whether I did or not.

"Q. Did you get the quilting frames originally from Mrs. Matthews' place?

"A. Yes, sir.

"Q. Then you knew where Mrs. Matthews lived?

"A. No, sir, because we went around from home, the other way around, we didn't go that way at all.

"Q. Well, you knew she lived on a street running exactly at right angles to Third Street north and south?

"A. No, sir, I wasn't positive where Mrs. Matthews lived; we came from South Hansen and went up a different direction entirely to get the frames.

"Q. Had you been over there before?

"A. No, sir."

It is contended by respondents that the discussion between Mrs. Call and the driver of the automobile, about where Mrs. Matthews lived, and the driver turning his head to look for the house and neglecting to watch the road ahead, as above set forth, were excusable under the rule applying to "diverted attention" and "temporary forgetfulness." (*Denton v. City of Twin Falls*, 54 Ida. 35, 28 Pac. (2d) 202, *Butland v. City of Caldwell*, 51 Ida. 483, 6 Pac. (2d) 493, *Osier v. Consumers Co.*, 42 Ida. 789, 248 Pac. 438, and *Giffen v. City of Lewiston*, 6 Ida. 231, 55 Pac. 545.) It is urged, however, by appellant that this was admittedly not *forgetfulness* and that it appears that the *diverted attention* was *intentional* and *deliberate* on the part of both the driver and Mrs. Call. It is further urged that, in order to excuse oneself from looking to see an obvious danger, the cause of "diverted attention" must come from an outside source,—something not originating within the mind and will of the one whose attention was diverted and not self-induced. Such, it seems, is the sound and rational rule. (*Bean v. City of Philadelphia*, 260 Pa. 278, 103 Atl. 727, *Bender v. Minden*, 124 Iowa, 685, 100 N. W. 352, *Jackson v. City of Jamestown*, 33 N. D. 596, 157 N. W. 475, *Schawe v. Leyendecker*, (Tex. Civ. App.) 269 S. W. 864, and 43 C. J. 1090, sec. 1855.)

■ This case is so close in the evidence presented, as to whether it does or does not disclose contributory negligence, as a matter of law, that the justices are not in unanimous accord on its import. We are admonished, however, by the rule announced in *Fleenor v. Oregon Short Line R. Co.*, 16 Ida. 781, 102 Pac. 897, that:

"Where the evidence on material facts is conflicting, or where on undisputed facts reasonable and fair-minded men may differ as to the inferences and conclusions to be drawn, or where different conclusions might reasonably be reached by different minds, the question of negligence is one of fact to be submitted to the jury. Where upon all the facts and circumstances there is a reasonable chance or likelihood of the conclusions of reasonable men differing, the question is one for the jury."

The foregoing rule has been uniformly followed ever since its announcement. (*Carr v. Wallace Laundry Co.*, 31 Ida. 266, 170 Pac. 107; *Denton v. City of Twin Falls*, 54 Ida. 35, 43, 28 Pac. (2d) 202.)

■ Having in mind the rule thus announced, for determining when and under what conditions the sufficiency of the evidence, to establish contributory negligence, will be determined, as a matter of law, we must, and do, hold, that the evidence here involved presents a question of fact on the issue of contributory negligence and should be submitted to the jury for its determination.

■ In order to cover the question of law on the failure of the driver to observe the road, counsel for the city requested the court to give the following instruction:

"You are instructed, gentlemen of the jury, that the driver of an automobile upon the streets of the city must use due care in the operation of said automobile, and if you find in this case that a defect existed in the street and that the driver of the plaintiffs' car, had he been looking, could have seen the defect, *but because of other conditions turned his head and failed to observe,* then and in that event he was guilty of contributory negligence and the plaintiffs cannot recover."

The objectionable portion of the foregoing instruction lies in the words italicized, that is, "but because of other con-

ditions turned his head *and failed to observe."* Now it is clear from the authorities that some conditions would justify and excuse the driver for turning his attention from the road; whereas certain other conditions would not do so. In order, therefore, to render the instruction proper and justify its being given to the jury, such "other conditions" should have been covered either in this instruction or by an independent instruction; that is to say, the jury should have been instructed and advised as to the general rule of law which justifies a driver turning his attention from the road, and driving along a street or highway without observing the roadway ahead. Instead of giving the foregoing requested instruction, the court gave Instruction No. 13, which was apparently intended to cover the same question as dealt with by appellant's requested instruction.

The court's Instruction No. 13 is as follows:

"The court instructs the jury that when a person has exercised the care and caution which an ordinarily prudent person would have exercised, he is not negligent, merely *because his attention was temporarily attracted from the surface of the road,* and in this case if you find from the evidence that Ben Call was exercising the care and caution of an ordinarily prudent person, while driving his automobile. down Third Street, the mere fact that his attention was attracted from the surface of the road *for the purpose of discovering the residence to which they were going, would not constitute contributory negligence."*

This instruction was obviously erroneous. We have italicized the objectionable part thereof.

As we have before seen, there are circumstances under which a driver is justified in turning his attention from the roadway temporarily, but that is not a general rule that is applicable to all instances of diverted attention. It is consequently a contradiction of terms to say that "when a person has exercised the care and caution which an ordinarily prudent person would have exercised," he is not negligent, "merely because his attention is temporarily attracted from the surface of the road," for the reason that there are instances in which he could not act as "an ordinarily pru-

dent person," and at the same time temporarily "turn his attention from the road." The cause or reason for his distracted attention might be a controlling circumstance in determining whether or not he acted as a *prudent person;* and so also might the condition of the road, or the place where he was driving, play an important part therein.

This instruction No. 13 was also prejudicial to the city for the reason that it took from the jury the very issue of contributory negligence by telling them that the "mere fact that his [the driver's] attention was attracted from the surface of the road *for the purpose of discovering the residence to which they were going, would not constitute contributory negligence.*" This instruction settled the question of contributory negligence as a matter of law and told the jury that this conduct would not subject the driver and his mother to the charge of contributory negligence.

It is further contended by counsel on behalf of the city, that the evidence was not sufficient to establish negligence on the part of the city, in digging and leaving open a ditch or excavation across the street; and that the evidence in fact shows that the ditch had been filled up, and at most there was nothing more than a mere depression in the street where the excavation had been made. On this subject there was a sharp conflict in the evidence, and it became a proper matter for the jury to determine.

As touching upon the law on the subject of the city's duty in maintaining the street in a reasonably safe condition, the city requested the court to give its instructions Nos. 3 and 10. We think instruction No. 3 was substantially correct and should have been given. But defendant's requested instruction No. 10 was both argumentative and uncertain and was properly rejected.

Since this case will have to be reversed and sent back for new trial, it becomes necessary for us to pass on appellant's assignments of error against the rulings of the court in the admission of evidence.

Respondents produced an X-ray picture and proved by Dr. Dean that he took the picture and that it is an X-ray picture of Mrs. Call's pelvis; and that the picture is in the

same condition it was in when made. It was thereupon offered and admitted in evidence over defendant's objection.

 The authorities all seem to agree that before an X-ray picture is admitted, it should be shown by competent evidence that it was taken by the method and in the manner generally recognized in Roentgenography and that it is a Roentgen photogram or X-ray shadow of the object under investigation. (*Joy v. Flax*, 101 N. J. L. 43, 127 Atl. 596; *Ladlie v. American Glycerin Co.*, 115 Kan. 507, 223 Pac. 272; *Stevens v. Illinois Cent. R. Co.*, 306 Ill. 370, 137 N. E. 859; *Bartlesville Zinc Co. v. Fisher*, 60 Okl. 139, 159 Pac. 476; *Bucktrot v. Partridge*, 130 Okl. 122, 265 Pac. 768; *Witte v. Hutchins*, 135 Kan. 776, 12 Pac. (2d) 724; 2 Wigmore on Evidence, 2d ed., sec. 795; note, 77 A. L. R. 952; 22 C. J. 916, sec. 1118.)

 Of course it is the mere use of idle and meaningless language, to say that the witness who identifies the picture must be able to state that it is a *correct representation of the object it purports to picture*, for the very obvious reason that it purports only to show shadows of objects not otherwise visible to the eye. A witness cannot truthfully testify that an X-ray picture is "a true and correct representation of the object it purports to show," unless it be conceded that he bases his statement on the scientific fact,— which seems to have become well established,—that the Roentgen skiagram does as accurately picture the object's shadow, as does the photograph picture an object's external surface. Such pictures, when properly interpreted to the jury, are very valuable evidence in a case, because of the manner in which they enable the jury to visualize an injury or condition under investigation.

The supreme court of North Carolina very aptly illustrated the point in the case of *Eaker v. International Shoe Co.*, 199 N. C. 379, 154 S. E. 667, by the use of a Biblical quotation, saying:

"The X-ray pictures are not like the man that looks in a glass. . . . . 'For he beholdeth himself, and goeth his way, and straightway forgetteth what manner of man he was.' James 1: 23, 24.'"

The science of X-ray skiagraphy is too well founded and generally recognized, to render it any longer necessary for a witness to testify to the reliability and trustworthiness of X-ray skiagrams as such, before admitting them in evidence. (2 Wigmore on Evidence, 2d ed., sec. 795, par. 3; 10 R. C. L., sec. 358, p. 1157; *Kimball v. Northern Elec. Co.,* 159 Cal. 225, 113 Pac. 156.)

It must first appear that the picture was taken of the thing or object under consideration, and that it was made by the usual X-ray method or process; and the position of the body at the time skiagraphed should be shown. Ordinarily X-ray exhibits or skiagrams are of no use and should not go to the jury, unless they are interpreted and explained to the jury by a competent X-ray or skiagraphic expert. (*Wosoba v. Kenyon,* 215 Iowa, 226, 243 N. W. 569; *Ladlie v. American Glycerin Co.,* 115 Kan. 507, 223 Pac. 272; *Vale v. Campbell,* 123 Or. 632, 263 Pac. 400; note, 77 A. L. R., 948 to 954 et seq.) Those who follow the profession of making X-ray pictures are usually qualified to interpret them. (*Whipple v. Grandchamp,* 261 Mass. 40, 158 N. E. 270, 57 A. L. R. 974, and cases above cited.) So also are the average physicians, though being a physician does not in itself qualify one as a competent interpreter of an X-ray picture. (*Rawleigh v. Donoho,* 238 Ky. 480, 38 S. W. (2d) 227.)

In the case at bar the X-ray picture that was introduced would be utterly useless as evidence without being explained, as it is clear, upon a view of the picture, that the average layman would get no information about the injury here complained of unless the alleged fracture is pointed out and explained to him. After examining this exhibit, we find ourselves in very much the same state of uncertainty about what the picture discloses as was the Alabama court's predicament in *Demopolis Tel. Co. v. Hood,* 212 Ala. 216, 102 So. 35, after examining a very similar exhibit.

Appellant has taken exception to the ruling of the court in permitting the plaintiff, Mrs. Call, to answer certain questions propounded to her, which are as follows:

"Q. Now, do you know whether or not your trouble in walking is due to the injury you received in this accident?

"A. Yes, sir, I know.

"Q. State whether it is.

"A. Yes, sir.

"Q. Now, explain to the jury why you can't walk.

"A. Because of my hip and back being affected so through the injury, and it hurts me to walk. I can't get around. When I stand on my limb its numb and it affects me to walk around or get around, and the pain goes from my back up into my head, the back of my head and shoulders, when I walk.

"Q. Has the accident affected you in any other way, Mrs. Call, than you have already testified?

"A. Yes, sir; before the accident I weighed 140 pounds —164 pounds, and now I weigh 138."

More latitude is allowed in the examination of the party to an action who is describing injuries received and their effect than is allowed other witnesses. In so testifying, such a witness necessarily expresses his or her opinion and conclusions, as to both the extent and effect of the injury. While such a witness may not testify as an expert and give expert opinion, he may, nevertheless, state his or her notion or feeling as to the character and extent of the injury inflicted and the personal results he or she has experienced therefrom. (*El Paso Elec. Co. v. Cannon*, (Tex. Civ. App.) 69 S. W. (2d) 532 (par. 3); *Boa v. San Francisco-Oakland T. Rys.*, 182 Cal. 93, 187 Pac. 2 (par. 12); *Ensley Holding Co. v. Kelley*, 229 Ala. 650, 158 So. 896, 900; *American Nat. Ins. Co. v. Walker*, (Tex. Civ. App.) 81 S. W. (2d) 1061; *Latky v. Wolfe*, 85 Cal. App. 332, 259 Pac. 470.) The extent, to which such inquiry may be carried by a party to the action, is in a large measure within the discretion of the trial court; and in the case at bar we do not think that discretion was abused.

On the trial plaintiffs were allowed to introduce the minutes of a meeting of the city council, reading as follows:

"At this time Attorney Lowe representing Aaron Call addressed the council relative to an injury received by Mrs. Call on or about the fourteenth of October, while crossing Third Street between Malta and Oriental. A general discussion was then had, after which the Mayor referred the matter back to the street and bridge department for a thorough investigation. A report was to be made at the next council meeting."

Counsel for the city objected to this testimony and assign its admission as error. This exhibit should not have been received. It had no bearing on the questions at issue or the merits of the case in any respect.

The conclusions we have above reached render it unnecessary to discuss the questions presented involving the denial of the motion for new trial.

The judgment is reversed and the cause is remanded for a new trial in accordance with the views herein expressed. Costs awarded in favor of appellant.

Givens, C. J., and Morgan and Holden, JJ., concur.