[L. A. No. 16158.  In Bank.—July 27, 1937.]

LOVELLA REESE, Respondent, v. E. F. SMITH, Appellant.

Swaffield & Swaffield, W. Torrence Stockman and Owen Meredith for Appellant.

Stevens Fargo and George W. Fenimore for Respondent.

NOURSE, J., *pro tem.*—The plaintiff sued for injuries alleged to be the result of negligence on the part of the defendant in the preparation and sale of pork sausages which she alleged were unwholesome and unfit for human consumption. A second cause of action was pleaded charging a breach of the implied warranty that such food was fit for consumption. Judgment for $1630 went for the plaintiff on both causes of action after a trial by the court sitting without a jury. On appeal to the District Court of Appeal this judgment was reversed. The opinion of Doran, J., is a fair and complete statement of the facts which correctly disposes of the issue of negligence and we quote and adopt that part of the opinion reading as follows:

"The evidence reveals that plaintiff was a widow, twenty-nine years of age; that she lived alone; and until a month previous to the incident complained of had been in the employ of the S. E. R. A. as a seamstress at the monthly wage of $24. On the day in question she ate her breakfast, consisting of a glass of milk and a piece of bread, at 7:00 o'clock in the morning. She testified that she ate nothing else all day until 5:30 that evening. About 5:00 o'clock she visited appellant's place of business and purchased a pound of link sausage, which was wrapped in paper held in place by a 'sticker'. Plaintiff returned to her home, about four blocks

distant, broke off two of the links of sausage, fried them and prepared them in the form of a sandwich. The remainder of the sausage she replaced in the original wrapper which, she testified, she then put 'in the ice box on the ice'. She was taken ill as she finished eating the sandwich; her testimony was: 'After I had got through eating, just before, I taken a pain in my stomach.' Within a few minutes after she was taken ill neighbors offered their assistance and the police department was notified. By the time the officers had arrived it was dark, and after hearing plaintiff's account of the probable cause of her illness, one of the officers went to the ice box to examine the remainder of the sausage. This was about two hours and a half after the sausage had been purchased. He testified: ' "Let's go back in the kitchen and see if we can find this meat she said she had been eating from." ' (Addressing one William Hardy, a neighbor, who accompanied the officer to the kitchen.) 'And he (Hardy) opened the ice box and we looked for any package that looked like it might hold meat, and there was a package in there that we found some sausage in.' Question by attorney for plaintiff: 'What happened to the package? A. Well, it was link sausage, large link sausage, and I believe there was three and a half links, and the half link looked like it had been broken or else cut in half with a very dull knife and had a ragged edge. I laid it on top of the high oven there, the man was with me in the kitchen, and I used my flashlight, and on the open end of the sausage there were several maggots.'

"The witness Hardy testified that he, at the same time, saw two maggots 'between the links'. The officer was asked whether there was any ice in the ice box, to which he replied: 'I couldn't say. We didn't open the ice side.' He also testified that he saw other articles in the ice box, to which he paid no attention.

"Plaintiff's physician testified that he diagnosed plaintiff's illness as 'botulism', and that in his opinion it was caused from eating the above described sausage.

"The evidence further reveals that after the ambulance had taken plaintiff to the receiving hospital, the officer took the sausage to the butcher who had sold it to plaintiff, where it was examined and compared with like sausage still on sale. The officer testified that aside from the appearance of the maggots, the sausage which he brought with him gave no

evidence, either from odor or appearance, of being unwholesome. The next day inspectors from the Los Angeles Health Department visited plaintiff's home and obtained the remainder of the sausage. Their testimony was to the effect that there were no maggots at that time and from their examination it appeared fresh and wholesome. It was then taken to the Health Department for chemical and microscopic examination. The evidence reveals that from this examination the sausage was found to be pure and wholesome and 'no organism of the food poisoning groups were present'.

"It was established by expert testimony introduced for the defendant and unrefuted that no examination was made for bacillus botulinus because such organisms only flourish where there is no oxygen present,—such as in canned goods. It was also contended by experts for the defense that the effect of food poisoning, particularly botulism, does not manifest itself for several hours after contaminated food is eaten; and, that the appearance of maggots was not necessarily evidence of contamination.

"The only expert evidence offered by plaintiff was the testimony of her physician who testified, 'I diagnosed the case as botulism.'

"The court found, 'That it is true that on or about August 28, 1935, plaintiff purchased from defendant E. F. Smith at 4222 South Central avenue, Los Angeles, California, for her own consumption, food consisting of meat, and that on or about said date said plaintiff ate said meat so purchased and immediately thereafter became violently ill and suffered severe and permanent injuries and suffered severe nervous shock, to her general damage. . . . That it is true that the aforesaid illness, injury and damage to plaintiff were directly and proximately caused by the negligence and carelessness of defendant E. F. Smith only, in manufacturing, producing, preparing, compounding, packing, offering, keeping and selling the said food to plaintiff; said food being a filthy, decomposed and putrid animal substance and unwholesome and unfit for human consumption.'

"It would appear as a first impression, from a cursory examination of the record herein, that there is merely a conflict in the evidence, and that therefore, in the absence of prejudicial error, the judgment should stand. A more careful study of the evidence, however, and a consideration of

the findings in the light thereof, develop the decisive question herein: namely, whether there is any evidence at all to support the court's findings above quoted in regard to the quality and character of the food. Obviously, if the evidence is insufficient in this respect, the question as to a conflict and also the question as to whether the evidence preponderates are eliminated.

"That the finding of the trial court on conflicting evidence will not be disturbed on appeal, is elementary, but that doctrine contemplates that the finding must be based on a 'real and substantial conflict upon material points'. (2 Cal. Jur., sec. 545, p. 929.) In that connection it should be noted that upon the issues raised by the pleadings, the plaintiff was bound to assume the burden of proof and in the end prevail by a preponderance of the evidence. If the existence of an essential fact upon which a party relies is left in doubt or uncertainty, the party upon whom the burden rests to establish that fact should suffer, and not his adversary. (*Patterson* v. *San Francisco etc. Ry. Co.*, 147 Cal. 178 [81 Pac. 531].) A judgment cannot be based on guesses or conjectures. (*Puckhaber* v. *Southern Pac. Co.*, 132 Cal. 363 [64 Pac. 480].) And, also, 'A finding of fact must be an inference drawn from evidence rather than on a mere speculation as to probabilities without evidence. A majority of chances never can suffice alone to establish a proposition of fact, since the slightest real evidence would outweigh all contrary probabilities.' (23 Cor. Jur., sec. 1750, p. 18.)

"In analyzing the evidence adduced at the trial it is at once apparent that the presence of the maggots is a treacherous circumstance,—a circumstance fraught with the capability as well as the tendency to deceive and mislead. The memory of that with which maggots are generally associated from common experience naturally arouses a feeling of revulsion. Under the influence of emotions thus aroused a greater significance and importance might easily be attributed to the presence of maggots than pure reason would allow. Biologically, maggots are but the larvae of insects, most commonly that of the housefly. They are not poisonous; indeed it is conceded that maggots are used in modern surgery for the treatment of open wounds. Moreover, maggots are not found exclusively on 'filthy, decomposed and putrid animal substance'. Their presence, therefore, standing alone,

furnished no evidence that the sausage was of the quality and character found by the trial court.

"The record reveals but two facts legally established by plaintiff to support the judgment: First, that she became ill while eating the sausage; and, second, that there were maggots on the remainder of the sausage."

It should be added that the undisputed evidence showed that defendant's place of business was clean and sanitary and that the food was prepared and sold under proper local sanitary regulations and inspection. There is not a word of evidence to support the finding of negligence on the part of the defendant.

Upon the second cause of action appellant's attack rests upon the claim that the evidence is insufficient to prove a breach of the implied warranty that the food when sold was reasonably fit for consumption. The trial court found that respondent's illness was caused by her consumption of the sausages, "said food being a filthy, decomposed and putrid animal substance and unwholesome and unfit for human consumption". This finding is based solely upon the testimony of respondent's physician, who testified that he reached the conclusion that the food was unwholesome because of the presence of the maggots—that maggots feed on putrid material only and never feed upon wholesome, clean flesh. It is a matter of common knowledge that flies will attack and lay their eggs upon fresh clean meat and that maggots will hatch and develop in a very short time thereafter. It is entirely upon this false premise that the physician based his testimony—that the meat was putrid because maggots were on it, that maggots were on it because it was putrid, that because it was putrid the maggots were toxic, and that because they were toxic they caused respondent's illness. The only credible evidence as to the condition of the meat was that it was pure and wholesome when chemically analyzed on the day following the sale. Yet this was the only portion of the meat sold upon which any maggots had been seen. This is the "fact" upon which the physician drew his inference that the meat was decomposed on the previous evening. But reason compels the opposite inference and reason is the requisite of all inferences. It was said in *Mix* v. *Ingersoll Candy Co.*, 6 Cal. (2d) 674, 681 [59 Pac. (2d) 144]: "Although it may frequently be a question for a jury as the trier of facts to de-

termine whether or not the particular defect alleged rendered the food not reasonably fit for human consumption, yet certain cases present facts from which the court itself may say as a matter of law that the alleged defect does not fall within the terms of the statute. It is insisted that the court may so determine herein only if it is empowered to take judicial notice of the alleged fact that chicken pies usually contain chicken bones. It is not necessary to go so far as to hold that chicken pies usually contain chicken bones. It is sufficient if it may be said that as a matter of common knowledge chicken pies occasionally contain chicken bones.''

Hence, since the proven facts are that maggots were attached to this particular meat which was found to be pure and wholesome the following day, the only reasonable inference to be drawn from these facts is that maggots will be found on meat which is not putrid and decomposed. For these reasons the testimony of this witness in which he drew the conclusions above noted does not create a conflict in the evidence and does not meet respondent's burden to prove that the food was not reasonably fit for human consumption as required by section 1735 of the Civil Code.

The judgment is reversed.

Edmonds, J., Shenk, J., Sturtevant, J., *pro tem.*, and Seawell, J., concurred.

Langdon, J., and Curtis, J., dissented.