SHELL OIL CO., Inc., et al. v. HAUNCHILD et ux.

No. 33855.   Oct. 10, 1950.

*223 P. 2d 333.*

Geo. W. Cunningham, Jesse M. Davis, Joseph W. Morris, and Gordon Watts, all of Tulsa, and R. O. Wilson, of Ponca City, for plaintiffs in error.

Irving D. Ross and David Ross, both of Newkirk, and Roy Cox and Charles Buhrman, both of Blackwell, for defendants in error.

GIBSON, J. This is an action by defendants in error against Shell Oil Company, Continental Oil Company, and others, to recover damages arising from the salt water pollution of the soil of plaintiffs' farm alleged to have been caused by defendants. Plaintiffs were awarded judgment in the sum of $1,000 against the defendants named and they appeal therefrom. The parties will be referred to as they appeared in the trial court.

Plaintiff's farm, consisting of 90 acres and described as E. 1/2 S.W. 1/4 sec. 8, twp. 28 N., R. 1 W. and S.W. 1/4 S.E. 1/4 N.W. 1/4 of said section, is located within an oil field known as South Braman. For years oil, accompanied by salt water, had been and was, at the time of the injury complained of, being produced on plaintiff's farm and the adjoining acreage. Defendants operate an oil and gas lease on the land adjoining plaintiffs' farm on the north and thereon, about 800 feet north of plaintiff's 10-acre tract, there is a well known as the Horn well which is used by defendants for disposal of salt water by pumping same under pressure into the Tonkawa Sand at depth of 2,400 feet. The Horn well was converted into a disposal well in 1929 by Comar Oil Company, defendants' predecessor. Underlying the area of the oil field involved is a water sand which is 15 feet below the surface at the Horn well and 14 feet below at plaintiffs' 10-acre tract whereon plaintiffs have a well through which water was obtained for domestic purposes. In 1932 plaintiffs recovered judgment in damages against the Comar Oil Company for the permanent pollution of said water sand under the area of their farm. In 1932, by reason of the condition of the well, salt water injected therein arose to the surface around the casing and stood in the cellar. To rectify the condition cement was forced down through the inner casing until it came up to the surface between the inner and outer casings and between the casings and the wall of the hole. It is recognized by plaintiffs that the effect of the cementing was to prevent any further leak of salt water from the time of the cementing until the occasion involved herein.

The present action was instituted February 7, 1947, against defendants named and others operating leases on the northeast and southeast quarters of said section 8. It is alleged in the petition that the defendants and each of them have permitted salt water to escape upon the surface of the land the drainage of which is over the farm of the plaintiffs; have deposited same in ponds where they percolate into the soil and the underlying water strata; and have pumped same into wells with such force that the salt water in the underground sands and shales is forced to the surface, and that as a result thereof the soil of an area in the south 40 acres of plaintiffs' farm was permanently destroyed. Defendants, other than those appealing, went out of the case when their demurrers to plaintiff's evidence were sustained.

Defendants make two contentions. One, that there is no evidence establishing a causal connection between the acts of defendants and the injury of which plaintiffs complain. The other, that plaintiffs' action is barred by the statute of limitations. We consider them in the order made. There is no direct evidence of the fact of salt water escaping from defendants' well into the water sand, and the question is whether there is competent circumstantial evidence from which such fact could be reasonably inferred.

Plaintiffs' south 40, whereon the damage was sustained, except the eastern part thereof, is bottom land and is of approximately 10 feet lower elevation than the land north and east thereof, and said water sand lies about 4 feet below the surface. The surface drainage from the lands north and northeast is over said 40-acre tract. Extending east and west along the north line of the 40 is an open drainage ditch which connects with a similar ditch extending southward from the northwest corner of the 40. The ditches carried salt water that escaped from salt water ponds, and the north-south ditch was of sufficient depth to touch said water sand, and in 1946 water was seeping out of it into the ditch. The area damaged consists of 15 acres lying in the northwest part of the 40 and abuts said ditches. There are two producing wells upon plaintiffs' farm, one in the southeast corner of the 10-acre tract and the other directly south thereof on the north 40. The salt water produced is deposited in a pond on the southeastern part of the north 40. The salt water produced an the northeast quarter of the section is deposited in three ponds located in the southwest quarter thereof. Plaintiff W. A. Haunchild testified that his pond was about 7 feet deep and those on the northeast quarter 8 feet or more; that the latter ponds did not overflow; that the salt water flowed therein, apparently constantly, in a stream equivalent to that of a good hand pump. When asked what became of it, he replied "surface sand." The natural drainage from these ponds and the one on plaintiffs' farm is to the east-west ditch mentioned. Salt water was being produced on the land adjoining plaintiff's land on the west but there is no evidence of the manner of the disposal thereof. There is no evidence concerning the alleged operations on the southeast quarter of the section or of the operations on the land south of plaintiffs' farm.

Said plaintiff testified that during the early part of 1945 salt water bubbled up out of the soil over the said damaged area and ran off the surface into the ditches and thence south to the river; that said bubbling continued for a period of at least three months; that before the bubbling ceased one Robinson, a claim agent of defendant, noted the condition and inquired whence the water came and that he replied that he was satisfied that it was coming from defendants' disposal well by reason of the pressure applied therein, that some days later defendants had a crew working at the well with baler and other tools for about five days.

The defendants used the Horn well for disposal of salt water produced on the northwest quarter of said section and other lands and same was introduced into the Tonkawa Sand through the Horn well at a pressure of about 500 pounds. During December, 1944, the pressure required increased to as much as 900 pounds, and the resistance was sufficient to break the pump. In the latter part of that month they cleaned out the well and in January they acidized the Tonkawa Sand to insure greater porosity, and thereafter the salt water was injected at a pressure usually about 500 pounds. The uncontradicted evidence is that the increased pressure was due to accumulation in bottom of the well of a deposit that salt water leaves in the lines as it passes through. Throughout that period the pressure was constant and remained so when not pumping. The uncontradicted testimony of defendants' witnesses is to the effect that when a leak occurs the pressure will go down.

C. A. Stoldt, civil engineer, testifying as an expert witness for plaintiffs, in answer to the question whether water injected under pressure into the water sand at the Horn well could cause bubbling of water therefrom in the damaged area, replied:

"Assuming that there was pressure applied up here to the water in that surface water sand the water, or I mean sand that carries water close to the surface of the ground, assuming there was pressure applied up there it could cause a spring to break out or seep out most any place in the vicinity of that."

On cross-examination he testified further as follows:

"Q. If that pressure had been maintained constantly from 1932 until 1935 and there had been no springs show up at any time and shortly after 1945 the springs appeared, would you say that was coming from pressure and, if so, where? A. It would definitely be coming from pressure. That pressure could have been caused probably from a lot of things. But the only unusual thing apparently that I know anything about—there hasn't been any other mentioned—is that the brine was being put in this well under pressure and if springs, if it was a normal season and springs that had never existed broke out down here I would have to assume it was coming from the pressure being applied to that well.

"Q. Now, Mr. Stoldt, if the pressure was applied to this well and remained constant when shut in and otherwise if there had been a leak there, would there have been a drop in pressure on that gauge? A. That's true. When shut in—do you mean while the pumps are running or would you put the pressure gauge on there and bring it up to a definite pressure then close the valve and that pressure then remain constant?

"Q. I mean when the salt water was not being pumped in that your gate would be closed. At that time whatever pressure was on there would remain constant. A. If those were the conditions it would prove the well was not leaking . . . .

"Q. Now, Mr. Stoldt, as a matter of fact, moisture or rain or other type of liquid that would penetrate the soil up here, if the slope of that water sand is this sand here, and outcrop down here, that could be surface water which would cause a spring? A. That's true. I think I mentioned that while ago. . . .

"A. There has been no testimony, so far as I know, whether it was a rainy season or whether it was a dry season or what. There is a lot about this that I don't know. The only thing here, you are applying your brine up here under pressure. And you say you close the valve and the pressure remains constant. If there is not a drop in pressure there, I can't see how your well is taking any water.
". . . .

"Q. You have to eliminate every other possible source of water in that zone before you can say definitely it comes from one place or another? A. That's right.

"Q. Have you eliminated all possible sources not only on this farm but all over the countryside? A. The question which was hypothetical, as I recall it, was that if pressure was applied to the sand up here—

"Q. Yes, that's right. A. —could it possibly cause springs to show up down here?

"Q. Yes. A. I said it could.

"Q. Would it cause them to show up any place between there and the well? A. Yes."

The evidence is to be considered under the following rules. In Shell Petroleum Corporation v. Blubaugh, 187 Okla. 198, 102 P. 2d 163, there is said:

"It is noted that no witness testified either directly or by opinion that the gas and oil found in plaintiff's water well escaped from any of the operations of defendants. Plaintiff's theory is that the circumstances shown are sufficient to sustain a finding of the jury on this point.
". . .

" . . . In order to sustain a recovery, however, it was incumbent upon plaintiff to establish a causal connection between the violation complained of and the injury received. See Pine v. Rizzo, 186 Okla. 35, 96 P. 2d 17. Such connection cannot be established by basing inference upon inference, or presumption upon presumption. Prest-O-Lite Co. v. Howery, 169

Okla. 408, 37 P. 2d 303; Turman Oil Co. v. Carmen, 179 Okla. 388, 65 P. 2d 963."

And in Phillips Petroleum Co. et al. v. Davis et al., 182 Okla. 397, 77 P. 2d 1147, we said:

"A verdict may properly be predicated on circumstantial evidence, but it cannot be based upon mere speculation and conjecture."

As declared by Mr. Justice Pollock, in Chicago, R. I. & P. Ry. Co. v. Rhoades, 64 Kan. 553, 68 P. 58:

"So to establish a theory by circumstantial evidence that it may be accepted as a fact proved, the known facts relied upon as a basis for the theory must be of such nature and so related to each other that the only reasonable conclusion that may be drawn therefrom is the theory sought to be established."

The alleged act of negligence which must be proved in order to warrant the verdict is the fact that salt water escaped from the disposal well.

The theory of plaintiffs is stated as follows:

"The salt water going into defendants' disposal well was pressurized and the salt water coming out on plaintiffs' farm was pressurized: It came out not as a seepage, but under such pressure as to cause it to 'bubble up.' It came up out of the ground with such force as to bring up with it quantities of sand Fountains developed over a large area, It is our theory that this matter of *Pressure* proves our case both affirmatively and by elimination; Affirmatively, in that the evidence shows defendants were using pressure in their nearby disposal well; and by elimination in that no where else in that vicinity was pressure being applied to the disposal of salt water. . . .

" . . .

"For 12 years or more, defendants had operated their disposal well under 500 pounds pressure or less. Then the deep salt water sand began to clog and defendants began using additional pressure, running it up to as high as 900 lbs. per square inch. A short time after the pressure was increased the salt water fountains suddenly developed in the alfalfa field. Soon thereafter the disposal well was acidized and the pressure was lowered back to and below its 12 year normal and immediately the 'bubbling up' ceased, the salt water stopped and the alfalfa field returned to normal, except that it is now sterile from the salt deposits. Thus directly following the excessive pressuring, the salt water fountains developed in our alfalfa field; and immediately following the release of the excessive pressure, the fountains ceased.

"It is plaintiffs' contention that these circumstances establish defendants' liability beyond any doubt."

The word "nearby" is hardly appropriate in view of the fact the well was one-half mile or more from the polluted area. And the statement that there was no other disposal well in the vicinity has no support in the evidence. That the bubbling showed the existence of pressure is clear but plaintiffs' witness Stoldt testified specifically that the pressure could have arisen other than from a disposal well under pressure. Any theory that the fact of escape from defendants' well has been established through elimination is untenable by reason of the absence of any evidence to such effect.

The mere fact of the coincidence in point of time between the bubbling on the premises and the application of extraordinary pressure at the well is not sufficient to establish the fact of escape at the well. If the fact of such escape were shown to exist at the time of the bubbling a permissible inference of cause and effect could properly arise. But without evidence of such escape other than the fact of the bubbling which denoted pressure that could come from the well, if there applied, is to predicate the escape upon inference on inference or conjecture.

In principle the following, said in Shell Petroleum Corporation v. Blubaugh, supra, is applicable here:

" . . . No witness, expert or non-expert, gave an opinion that the damage to the well was traceable to the abandoned oil wells hereinbefore referred to. There was no evidence and no facts presented from which it might be inferred or presumed that there was an escape of pollutive substances from the abandoned wells of defendants into the fresh water strata of plaintiff's water well at any place on, the lease or in the vicinity thereof. In the absence of such showing we have no alternative but to hold that there is no evidence that the pollution of plaintiff's well is traceable to any operation of defendant company."

The whole theory of the escape into the water sand is based upon the extraordinary pressure that was applied and continued at the disposal well. Such an inference can have no proper foundation, for the testimony of plaintiffs' witness (Stoldt) and that of defendants' show positively that the pressure would fall if there were a leak. The force of this evidence is recognized by plaintiff and the effect thereof is sought to be minimized by contending that it is at most opinion evidence and does not negative the possibility that the salt water could have escaped and not reaching the pit of the well by reason of the cement found outlet under pressure through the water sand. As a matter of fact, such an escape is negatived by the evidence, but since there is no evidence, direct or by inference, to support the fact of such an escape and same is posed as a possibility, it is in the realm of conjecture and not competent as evidence. Undisputed credible testimony may be overcome by circumstantial evidence, but such is true only where same is at variance with the facts and circumstances of the case or reasonable inferences to be drawn therefrom. Ironside v. Ironside, 188 Okla. 267, 108 P. 2d 157. From what has been said it follows that the evidence is insufficient to support the verdict.

In support of the second proposition defendants urge that the permanent damage was obvious to plaintiffs as early as in December, 1944, which was two years before the institution of the action on February 7, 1947. This conclusion is sought to be supported by plaintiffs' statement that the water was bubbling out before they cleaned the well out, which was in December. It is not clear from the witness's testimony whether the occasion referred to by the witness was the cleaning out in December or the acidizing in January, 1945, nor is the time of the acidizing fixed in the evidence. The force of this evidence is to establish the time at which he had knowledge of the bubbling and does not necessarily denote the time when the permanent damage was obvious, which is controlling. Shell Petroleum Corporation v. Hess, 190 Okla. 669, 126 P. 2d 534. Plaintiff testified that same was obvious in the "spring of 1945" and tied the fact to the condition of the alfalfa at that time. The burden of proof was upon the defendants. The evidence is indefinite and it cannot be said as a matter of law that burden was sustained.

The judgment is reversed and case remanded, with instructions to grant a new trial.

DAVISON, C. J., and WELCH, LUTTRELL, HALLEY, JOHNSON, and O'NEAL, JJ., concur.