256 P.2d 215

**SPLINTER v. CITY OF NAMPA et al.**

No. 7828.

Supreme Court of Idaho.
April 1, 1953.

Rehearing Denied April 28, 1953.

Porter, C. J., and Givens, J., dissented.

Garrity & Garrity, Nampa, and Elam & Burke, Boise, for appellant.

Frank F. Kibler, Nampa, J. F. Martin, Boise, George Donart, Weiser and Van de Steeg & Schiller, Nampa, for respondent.

TAYLOR, Justice.

Subsequent to the prior appeal herein, Splinter v. City of Nampa, 70 Idaho 287, 215 P.2d 999, 17 A.L.R.2d 665, and after defendants had answered, the cause was tried to a jury and judgment was entered on the verdict in favor of the plaintiff, Splinter, and against both defendants. Thereafter, the defendant, City of Nampa, filed its motion for judgment notwithstanding the verdict, based on the grounds (1) that the evidence is insufficient to support the verdict, and (2) evidence affirmatively shows that the plaintiff was guilty of contributory negligence. This motion was granted and plaintiff Splinter brings this appeal from the judgment entered thereon.

The appellant Splinter was the owner of a business building, in the city of Nampa, with a frontage on 1st Street South of 40 feet and extending northeasterly to an alley a depth of approximately 90 feet. The front part of the building, to a depth of possibly 34 feet, was two stories high, and the rest of the building one story. The building, as originally constructed, extended back from the street a depth of 60 feet with a basement under the rear 26 feet. The walls of this original structure were 12-inch brick, the rear wall being set upon a basement foundation wall of lava rock. Subsequently the building was extended 30 feet to the alley with 8-inch brick walls, and this part was also excavated and the basement extended to the alley. The original rear wall was left in place, so that both the basement and the ground floor were divided by that wall, except for access doors. The entire building was divided into equal parts by a longitudinal division wall. Facing the building from the street, the left-hand side was occupied by the "Alibi Inn", and the right-hand side by the "Forbidden Palace", a restaurant operated

by Chinese tenants of appellant Splinter. The kitchen of this restaurant occupied the rear portion of the cafe side, extending from the original rear wall to the alley. The front 60 feet of the ground floor was occupied by the dining area. The original basement, being under the rear 26 feet of this dining area, was occupied by a coal furnace with a floor type register for the heating of the dining room. The basement under the extended part of the building, under the kitchen, was used for storage of coal and other supplies. The stairway leading to the basement was located toward the rear of the kitchen next to the partition wall. There was a rear door from the kitchen opening onto the alley at the rear of the building. This alley is 10 feet wide with a paved surface. In the rear wall in the alley, there was a coal chute opening into the basement, which was surrounded by a concrete box or pit, 16 inches wide and 33 inches in length and about 30 inches deep.

The tenants operating the cafe, desiring to have facilities installed for the use of gas in cooking, applied to the defendant, American Butane Company, for such installation. The local manager of the butane company, K. C. Baird, testified that he, in company with the manager of the cafe, one Kim Fong (later killed in the explosion), went to, and obtained the permission of the plaintiff to install the necessary equipment, and to use gas in the building. The plaintiff testified that he did not remember that conversation, although he wouldn't say that

they did not discuss the matter with him, and that the first he knew of the use of butane fuel was in the early summer of 1946 or 1947, when Kim Fong took him into the kitchen and showed him the new range. Later in the trial, while on the stand as a witness for the butane company, Baird testified that at the time he and Kim Fong sought permission to install gas facilities, the plaintiff had his office on the second floor of the building involved, and that when they first went up to see him he advised them he would investigate to learn whether the use of gas in the building would affect his insurance, and that they went back to his office the next day and on this second visit the plaintiff consented to the installation and use of gas in the building. Although called to the stand as a rebuttal witness, the plaintiff did not deny these additional facts relative to his knowledge of, and consent to, the use of gas in his building. Thereafter, Baird, for the butane company, made application to the City of Nampa for permission to install a butane tank on city property at the rear of the cafe. This permission was granted by the city council at its regular meeting December 3, 1945, as follows.

"The American Butane Company requested permission to install a butane tank in the alley near the rear of the Forbidden Palace Cafe.

"Moved by Robinson and Seconded by Kinney that the aforesaid request be granted, provided the tank be buried

under the direction of the City Engineer. Motion Carried."

The city engineer, John Griffith, was not a witness, having died prior to the trial. Accepting Baird's testimony as to the facts, he and the city engineer met in the alley early in December, 1945, on the day the tank was installed, and Griffith showed him where to put the tank; that is, to bury it next to the rear wall of the cafe. Baird expressed a desire to put the tank above ground at the rear of another building across the alley and run the service pipe under the alley; his reason for preferring such location was that he considered it more safe and more accessible for filling and servicing by his tank driver; that Griffith objected to that location because of the necessity of digging a trench across the alley; and that the tank was installed at the place indicated by the engineer. The tank was so located that the end containing the valves and service connections protruded into, and were accessible through, the pit surrounding the coal chute opening. Whether this precise spot along the wall where the tank was placed was also selected by the engineer, or whether it was dictated by convenience in installing and servicing of the tank, the witness did not say.

The tank remained in this position from the time it was installed early in December, 1945, until after the explosion, which occurred on the evening of November 15, 1947. During this time it was filled or the supply of gas replenished an average of once each week.

During the evening of November 15, 1947, one of the Chinese 'phoned to the butane company for a delivery of gas and, a little later, again called, reminding the person who answered that he had earlier requested a delivery and that it had not arrived. Whether the urgency was due to a leak in the line which caused the Chinese to think his supply was low, or, it being Saturday night, he wanted to be sure he would have enough for his needs until Monday, is left to surmise. The delivery truck driven by one Kellum, who testified he was employed as an installation and service man and that he delivered gas only on emergency occasions, arrived shortly before eight o'clock. Kellum testified that upon his arrival the tank was a little less than twenty per cent full; that he did not detect an odor of gas when he inquired at the kitchen door whether they wanted fuel; that he put in 50 gallons; that he made a good connection and there was no leakage; that he did not smell or hear escaping gas during the transfer of the fifty gallons; that if it had been escaping he could have heard it; that after the fifty gallons was transferred he shut off the motor, closed the valves on the "liquid line", then disconnected the "vapor line", rolled it up and put it on his truck. In doing this he passed the kitchen door, and both in going and coming he smelled gas, which caused him some alarm; that he

called to the Chinese inside "and told them to cut their fires until I could check on the nature of the leak." He then went to the coal chute to disconnect the liquid line; that as he stooped over and before he had touched the connection the explosion occurred. He had not detected more than the normal odor of gas while making and undoing the connections at the coal chute. He was thrown across the alley and rendered unconscious. Later coal particles were found imbedded in the skin of his face.

Baird further testified that he didn't consider the installation safe because in case of failure or breakage of equipment or the rupture of a line, gas might be spilled in the opening; that he told the engineer he did not consider it safe, but that he had not so advised any other city official, nor the plaintiff, nor the tenants; that when the connections are properly made no gas is spilled in filling the tank; that as long as the tank and its fittings are in working order, no spilling or leakage occurs unless the operator is careless or negligent in filling it. He further testified that on two or three occasions he or one of his employees had been called to the cafe to reset burners or make repairs or adjustments on the gas ranges, and that on one of these occasions the oven door had been blown off the large range by an explosion of gas inside the oven; that the oven burner was not equipped with pilot light and that when the gas was left turned on an explosive mixture accumulated in the oven.

The witness Clarence Knudsen testified that he was distributor for the Knu-Gas Company, operating a business competitive with that of the defendant, American Butane Company, in Nampa; that he arrived on the scene shortly after the explosion, checked the valves on the delivery truck and the storage tank and found them closed. We assume that the valves referred to are the valves at each end of the "liquid line" and "vapor line", because the witness further testified that the service line on the low pressure side, going into the building, had been broken inside the building and that he held his hand over it to prevent the further escape of gas until the valve controlling it could be closed. This witness and others then present heard gas escaping underneath the debris which covered the pit where the tank valves were located. Clamps were obtained and the "liquid line", which was still connecting the supply truck with the storage tank, was clamped and cut so that the truck could be moved out of the way. When the debris had been sufficiently cleared away from the storage tank valves, it was found that gas was leaking from the connection between the "liquid line" and the intake valve on the storage tank. When the tank is being filled the gas is forced into the tank against an "internal valve" which, when functioning properly, is closed by pressure within the tank, and seals the intake when the pres-

sure from the outside is discontinued. The knurled collar, by means of which the connection between the "liquid line" and the tank is made, was found to be loosened "about one turn." This indicated that the internal valve in the tank had not closed properly, and that gas was escaping past it and out around the seal in the coupling which was loose. The collar on this coupling is designed to make a leakproof seal when turned up tight by the use of fingers and thumb, without the aid of a wrench. The loose collar was turned up by the witness and the escaping gas stopped. The witnesses were not definite as to the length of time during which gas was escaping from the tank through these two leaks. It was estimated to be about an hour. Knudsen also testified that he regarded the location of this tank as dangerous, because if gas were spilled, it would go into the basement; that there is occasional spilling in the servicing of such tanks, occasioned by a sticking valve or by carelessness of the operator. He gave it as his opinion that the explosion occurred in the basement and that the gas found leaking at the connection could have been a cause of the explosion. But, on cross-examination, he testified as follows:

"Q. But you are not expressing the opinion that it was leaking at the time they filled that tank? A. I don't believe that it was leaking when they were filling the tank, no.

"Q. And you don't believe it was leaking prior to the time the explosion occurred, do you? A. The only time that that can be leaking is when you are taking it off, yes.

"Q. Someone would have had to start taking it off. A. Someone would have had to start taking it off.

"Q. And if nobody had started to take that off, it couldn't have been leaking. A. That's true."

Having earlier testified that he did not think this connection was loosened by the explosion, it is apparent this witness believed Kellum had actually started to turn the collar on the coupling when the explosion occurred. In either event, it would appear from this witness' testimony that the leak at this connection did not commence until the explosion occurred; and, if that were the fact, then, of course, the gas which exploded came from some other source, and the location of the tank would not be a contributing cause.

The Chinese, Charlie Fong, one of the cooks, testified he had just gone to the basement for eggs; that he found the coal room door open; that he detected an odor of gas coming from that direction; that he had just started toward it to close it when the explosion occurred. He was badly burned about the head, face, shoulders and abdomen. At the time, he was near the foot of the stairway. The respondents

urge that his injuries indicate that he was burned by the flash of the explosion coming down upon him from above. He further testified that he did not detect any odor of gas or anything wrong in the kitchen, or anything wrong with the two gas ranges, before going to the basement. On cross-examination he was asked if the gas fires were out when he went out and he answered, "Yes, sir, I hear somebody yell turn the gas out, but I don't know. Kim does that." This witness' testimony that he did not smell gas or observe anything wrong in the kitchen was impeached by officers who visited him in the hospital three or four days after the explosion, who testified that he there said that the gas smell was bad in the kitchen five or ten minutes before the gas man came. He was also contradicted by the coroner, William Talley, who testified that, in company with a stenographer and the sheriff, he placed the witness under oath at the hospital, and recorded his answers to several questions in which he testified as follows:

"A. All the fire was turned out.

"Q. Did the driver tell you to turn it out? A. Yes. I tell him the gas run over. It run out of the stove.

"Q. Had you run out of gas? A. Yes. He tell me to shut it off. The pilot light was out and the gas run out on the floor for a few minutes, not very long.

"Q. Did anyone light a match? A. No one light match. I tell him I turn it off right away."

It is appellant's contention that the explosion occurred in the basement under the kitchen, and that it was caused by the ignition of gas which came into the basement from the storage tank by way of the coal chute, and that the presence of the gas in the basement was due to the negligence of the respondent City in locating the storage tank with its valves in the pit at the coal chute opening.

The respondent City's contention is that the explosion occurred in the kitchen, caused by ignition of gas which escaped in the kitchen either from the ranges or other fittings over which it had no control and for which it was not responsible.

There are circumstances appearing in the testimony which inferentially tend to support both of these contentions. Certain witnesses testified that the "floor seemed to come up." The plaintiff testified that the floor joists were sprung upward. Two witnesses testified they smelled gas in the vicinity of the hot-air register in the dining room just before the explosion, indicating that it was issuing from the basement. Although asked, certain of the witnesses were unable to answer as to whether the floor was broken downward through the floor joists, or the reverse. In one of the photographic exhibits, the floor joists appear to be displaced slightly downward.

The smaller of the two gas ranges was found, badly mangled, on top of a one-story building next to the one destroyed. The twelve-inch brick wall between the kitchen and the dining room had completely disappeared, as had also the street front of the building. Bricks and other fragments were blown clear across the street. A heavy I-beam from the front of the building was found out at the edge of the sidewalk next to the parking meters. The rear wall on the alley was likewise completely blown away. The roof and other parts of the superstructure fell in. The lava rock wall, dividing the basement, was found in place with comparatively minor damage. L. T. Lessinger, fire chief in Nampa for 25 years, with 15 years previous experience in the fire department of Boise, testified that in his opinion the explosion occurred in the general area of the kitchen. Then on cross-examination, the following:

"A. Well, for what it's worth, I would say that it started in the area immediately around the kitchen range or the kitchen.

"Q. In the basement or in the kitchen? A. It could have started in the basement under the kitchen, or in the actual kitchen itself."

The testimony of the experts is that liquid gas, such as that involved here, when released from pressure, vaporizes, and the resultant vapor, being heavier than air, will rapidly settle or flow into the lowest available area; that a mixture of anywhere from 2% to 10% of the gas with air is an explosive mixture; that such mixture would be exploded by the contact with any open flame, or the flash from a light switch or the brushes of a running electric motor.

The evidence shows that there were two electric motors in the basement running intermittently in the operation of two refrigeration compressors, and that there was a coal fire in the furnace under the rear portion of the dining area, and there were light switches in the kitchen.

It is apparent that gas spilled in the kitchen would also flow to the basement by way of the open stairway. Thus, not only is the source of the gas which exploded left in doubt, but the evidence does not determine whether the explosion occurred in the kitchen, or in the basement, or in both. The only facts established by the evidence beyond peradventure are that an explosion of gas occurred and that thereby plaintiff's building was destroyed. All other facts essential to a determination of respondent's liability must be gleaned from circumstances.

Circumstantial evidence is competent to establish negligence and proximate cause. Facts, which are essential to a liability for negligence, may be inferred from circumstances which are established by evidence. But, where circumstantial

evidence is relied upon, the circumstances must be proved, and not themselves be left to presumption or inference. St. Louis & S. F. R. Co. v. Mobley, 70 Okl. 297, 174 P. 510; Schaff v. Ferry, 105 Okl. 259, 232 P. 407; Star v. Brumley, 129 Okl. 134, 263 P. 1086; Brucker v. Matsen, 18 Wash.2d 375, 139 P.2d 276; Neel v. Henne, 30 Wash. 2d 24, 190 P.2d 775; United States v. Ross, 92 U.S. 281, 23 L.Ed. 707; Chicago, M. & St. P. R. Co. v. Coogan, 271 U.S. 472, 46 S.Ct. 564, 70 L.Ed. 1041; Anno. 95 A.L. R. 162. This court has held that inference cannot be based upon inference, nor presumption on presumption. Swetland v. New World Life Ins. Co., 35 Idaho 109, 206 P. 190; Johnson v. Richards, 50 Idaho 150, 294 P. 507; Common School Dist. No. 27 v. Twin Falls Nat. Bank, 50 Idaho 668, 299 P. 662; Wells v. Robinson Construction Co., 52 Idaho 562, 16 P.2d 1059; cf. anno. 95 A.L.R., subdiv. III, pp. 181–192.

The underlying principle applicable here is that a verdict cannot rest on conjecture; that where a party seeks to establish a liability by circumstantial evidence, he must establish circumstances of such nature and so related to each other that his theory of liability is the more reasonable conclusion to be drawn therefrom; and that where the proven facts are equally consistent with the absence, as with the existence, of negligence on the part of defendant, the plaintiff has not carried the burden of proof and cannot recover. Lowden v. Friddle, 189 Okl. 415, 117 P.2d 533;

Safeway Stores v. Fuller, 189 Okl. 556, 118 P.2d 649; Shell Oil Co. v. Haunchild, 203 Okl. 456, 223 P.2d 333; Mellon v. Kelly, 99 Mont. 10, 41 P.2d 49; Ashley v. Safeway Stores, 100 Mont. 312, 47 P.2d 53; Crowe v. Moore, 144 Kan. 794, 62 P.2d 846; Ranney v. Camden Fire Ins. Ass'n, 162 Kan. 706, 179 P.2d 190; Goodloe v. Jo-Mar Dairies Co., 163 Kan. 611, 185 P.2d 158; Scharff v. Jackson, 216 N.Y. 598, 111 N.E. 242; White v. Lehigh Valley R. Co., 220 N.Y. 131, 115 N.E. 439; Digelormo v. Weil, 260 N.Y. 192, 183 N.E. 360; Continental Casualty Co. v. Paul, 209 Ala. 166, 95 So. 814, 30 A.L.R. 802; Owl Drug Co. v. Crandall, 52 Ariz. 322, 80 P.2d 952, 120 A.L.R. 1521; Reese v. Smith, 9 Cal.2d 324, 70 P.2d 933; Showalter v. Western Pac. R. Co., 16 Cal.2d 460, 106 P.2d 895; Vale v. State Industrial Accident Comm., 160 Or. 569, 86 P.2d 956; Fisher v. Sheppard, 366 Pa. 347, 77 A.2d 417; Burton v. Holden & Martin Lumber Co., 112 Vt. 17, 20 A.2d 99, 135 A.L.R. 512; Moore v. Chesapeake & Ohio Ry. Co., 340 U.S. 573, 71 S.Ct. 428, 95 L.Ed. 547; Jankelson v. Sisters of Charity, etc., 17 Wash.2d 631, 136 P.2d 720; Hargis v. Paulsen, 30 Idaho 571, 166 P. 264; McMaster v. Warner, 44 Idaho 544, 258 P. 547; 20 Am.Jur., Evidence, § 1178, p. 1028; 32 C.J.S., Evidence, § 1039; Sherman & Redfield on Neg. (Rev.Ed.) § 46, p. 121, et seq.

Where it remains equally probable from a consideration of all of the evidence, that the injury resulted from the cause sug-

gested by the defendant, as from that suggested by the plaintiff, the plaintiff has not established his case. Annereau v. Ewauna Box Co., 176 Or. 509, 159 P.2d 215; Ruff v. Fruit Delivery Co., 22 Wash.2d 708, 157 P.2d 730; Gardner v. Seymour, 27 Wash.2d 802, 180 P.2d 564; Sniegowski v. Reece, 326 Ill.App. 255, 61 N.E.2d 272; Mutual Life Ins. Co. v. Hess, 5 Cir., 161 F.2d 1; One 1941 Oldsmobile Sedan v. United States, 5 Cir., 161 F.2d 348; Texas Co. v. Hood, 5 Cir., 161 F.2d 618; Roberts v. United States, D.C.Idaho, 17 F.Supp. 641. Circumstances which are merely consistent with liability are insufficient. Miller v. Gabbert, 154 Kan. 260, 118 P.2d 523; Craig v. Village of Meridian, 56 Idaho 220, 52 P.2d 145; Hoffer v. City of Lewiston, 59 Idaho 538, 85 P.2d 238.

Here the evidence leaves the source of the gas which caused the explosion entirely to conjecture. There is no direct evidence of a leakage of gas at the tank connections prior to the explosion. The man who delivered the gas testified quite positively there was none. The two witnesses most experienced in the handling of such gas, the managers of competing distributors, testified that in their opinion no gas was spilled during the filling of the tank, and that the spilling could occur only when there was a failure or breakage in the equipment used or negligence on the part of the operator. There was no evidence of any failure or breakage of equipment, nor of any negligence on the part of the operator, in this case. The apparent failure of the internal valve to properly seat when the filling was completed could not alone have caused or permitted any leakage, during the filling process, nor subsequently, if the coupling had been turned up tight. Therefore, the positive testimony of the man who delivered the gas is not inconsistent with any of the circumstances established by other evidence, and not being improbable or otherwise discredited, it is entitled to credit. Sullivan v. Northern Pac. Ry. Co., 109 Mont. 93, 94 P.2d 651; Esso Standard Oil Co. v. Stewart, 190 Va. 949, 59 S.E.2d 67, 18 A.L.R.2d 1319; Pierstorff v. Gray's Auto Shop, 58 Idaho 438, 74 P.2d 171; First Trust & Savings Bank v. Randall, 59 Idaho 705, 89 P.2d 741; In re Odberg's Estate, 67 Idaho 447, 182 P.2d 945.

Thus, we conclude that the evidence is not sufficient to justify the jury in inferring negligence on the part of the city, and further inferring that such negligence was the proximate cause of the explosion, in face of the fact that the evidence equally supports an inference that the explosion occurred from the ignition of gas which spilled or leaked from the installations within the building. However, if we assume an inference of negligence on the part of the city is justified, still we think the evidence quite conclusively shows contributory negligence on the part of the plaintiff. The duty which he as the owner of the property owed to

himself to guard his property from danger, known, or which should have been known to him, was a primary duty. Any duty which the city may have owed to him, by reason of its permission to his tenant to have the tank placed in the alley, was secondary to this duty which he owed himself. The evidence on this point is fairly susceptible of only one construction, and that is that he knew of and consented to the installation and use of gas by his tenants. He also admitted that he knew where the storage tank was placed. Witness the following from his cross-examination:

"Q. Anyone walking by there, looking at that opening or walking down the alley, could plainly see the end of that tank with valves attached to it, couldn't they? A. No they couldn't, not if they kept it closed, because it had a lid on top.

"Q. You kept a lid on top. A. There was a lid on top. Whether they kept it closed, I don't know.

"Q. But you don't know if that lid was ever kept on top of it. A. I never saw it open whenever I came through the alley.

"Q. You came through that alley frequently? A. Not too frequently, no. Not very frequently."

This knowledge required him to inform himself of the risks involved. Shepstedt v. Hayes, 221 Minn. 74, 21 N.W.2d 199; Sullivan v. Northern Pac. Ry. Co., 109 Mont. 93, 94 P.2d 651; McMasters v. Grennan Bakeries Co., 315 Pa. 44, 172 A. 402; Boltinghouse v. Thompson, Tex.Civ.App., 12 S.W.2d 253. Being thus informed, he assumed the attendant risks and cannot pass that responsibility on to the city.

Moreover, when a city grants a permit for an installation, or the doing of work, in its streets or alleys, if the installation or work is such that it becomes dangerous only by reason of negligence on the part of the permittee, in the manner in which the thing is done, or in the subsequent operation of the installation, the permittee is liable, not the city. Copeland v. City of Seattle, 33 Wash. 415, 74 P. 582, 65 L.R.A. 333; Wilton v. City of Spokane, 73 Wash. 619, 132 P. 404, L.R.A.1917D, 234; Amann v. City of Tacoma, 170 Wash. 296, 16 P.2d 601; Parmenter v. City of Marion, 113 Iowa 297, 85 N.W. 90; Maine v. City of Des Moines, 190 Iowa 1013, 181 N.W. 248; Johnson v. City of Huntington, 80 W.Va. 178, 92 S.E. 344, 11 A.L.R. 1337; Kreiger v. Village of Doylestown, 25 Ohio App. 286, 158 N.E. 197; Hubbell v. City of Viroqua, 67 Wis. 343, 30 N.W. 847; Earle v. Inhabitants of Town of Concord, 260 Mass. 539, 157 N.E. 628, 53 A.L.R. 762; Abernathy v. City of Columbia, 213 S.C. 68, 48 S.E.2d 585; Shepstedt v. Hayes, 221 Minn. 74, 21 N.W.2d 199; 2 Shearman & Redfield, Neg. (Rev. Ed.) § 296; 42 A.L.R. Anno. 1208; 38 Am.Jur.Mun.Corp., § 590, p. 285. Here there is no evidence that the

injury was caused by any danger inherent in the installation. The tank was filled more than a hundred times over a period of nearly two years under the same continuously prevailing conditions, without evidence of any dangerous accumulation of gas. So again, assuming that the evidence would support an inference of negligence on the part of the city in the location of the tank, and bearing in mind that there is no evidence of any failure or breakage which caused any leaking to occur at the tank, prior to the explosion, the only remaining possible inference of negligence involving the city would be negligence on the part of the operator in filling the tank. In other words, while an insignificant amount of gas will ordinarily escape in the filling of the tank, the loss of a dangerous amount (in the absence of the failure of equipment) could result only from negligence of the operator. Under the circumstances such negligence would be the negligence of the permittee in the operation of the installation. It would be the active, independent, intervening cause, and hence the proximate cause, of any resulting injury.

The evidence is wholly insufficient to support the verdict against the city and the judgment non obstante is therefore affirmed. § 10–224, I.C.

Costs to respondent.

THOMAS and KEETON, JJ., concur.

GIVENS, Justice (dissenting).

Appellant's second amended complaint alleged the City and the Butane Company negligently placed the storage tank with its valves protruding into the coal chute entering into the basement.

The jury rendered a verdict in favor of appellant against both defendants-respondents. Judgment notwithstanding the verdict was entered against appellant and in favor of the City, sustained on this appeal by the majority on the ground the evidence does not sufficiently show escaping gas—which undoubtedly caused the terrific explosion, killing several people and maiming others and completely destroying the building—came from this storage tank into the coal chute down into the basement and/or into other parts of the building, rather than from leaks in the pipe lines from the storage tank to the stoves in the kitchen or at the stoves within the building.

The trial court denied appellant's motion for a new trial as against the City because of the inadequacy of the verdict, which of course, was superseded by the judgment non obstante. The trial court granted the Company's motion for a new trial.

If the majority is correct in holding the evidence herein is insufficient to show the City is liable because of the claimed negligent place of installation of the storage tank—in other words, fails to show the escaping gas came from the tank and/or

its immediate connections rather than from the pipe line inside the building, then so far as the negligence alleged in the second amended complaint, namely, negligent installation of the tank, there could be no liability on the part of the Butane Company, unless the evidence on a new trial differed sufficiently from herein to overcome the deficiency which the majority opinion holds exists.

Of course, if the evidence as a matter of law shows the gas escaped from within the building and not from the tank or its valves, the majority opinion is correct. The converse is equally true and the sole question is whether there was sufficient credible evidence to sustain the verdict as to the City's liability.

The basis for the majority's factual conclusion is: first, the evidence does not conclusively show the valves were leaking prior to the explosion, though there was evidence they were leaking after the explosion. Second, the majority's concept that the explosion started or occurred in the kitchen and above the basement because of the greater damage above the basement, and that a Chinaman, sole occupant of the basement at the time of the explosion, was not more severely burned and/or injured. This deduction is untenable. Doxstater v. Northwest Cities Gas Co., 65 Idaho 814, 154 P.2d 498. Furthermore, this premise merely substitutes the majority's resolution of the evidence for that of the jury.

It seems reasonable to say the record conclusively shows there *was* a terrific explosion which killed and injured several people and destroyed the building; second, it is evident this explosion was caused by gas which escaped somewhere in or sufficiently close to the building to affect it directly and not any other adjacent building, the city block being solidly built up. The gas may have leaked at the tank, somewhere along the pipe line to the stoves, at the stoves, or any combination of these. There is no evidence as to the condition of the pipe line and/or the stoves after the accident and probably because of the force of the explosion, none would have been possible or controlling as to whether there might not have been a leak at all three places.

The result of the majority's holding is that no negligence could be sufficiently attributed to anyone to justify recovery, because if it is sought on a new trial to secure recovery against the Butane Company, the same reasoning which now supports the majority would support the conclusion it was not sufficiently shown the Butane Company, in the supervision of the installations within the building which it apparently carried on, was negligent in that it was not shown conclusively the leak was within the building, at the stoves, or a leak at the tank or the negligent filling thereof. There was some evidence gas had spilled on the floor, but whether in sufficiently large quantity to produce

the terrific explosion which resulted, is problematical and it could be argued with equal effect that it would be insufficient to show *the explosion* was caused by the negligence of the owners of the restaurant, if it was sought to impose liability on them in this regard. Furthermore, the explosion did not immediately succeed this leak, as the evidence indicates would have been the case if this leak were the responsible defect.

The result of the reasoning of the majority herein will be that no one is legally responsible herein for the destruction of property and killing and maiming of human beings. Thus, no plaintiff, present or prospective, may recover from any defendant, present or prospective, for ambushed catastrophe.

The reasoning in the majority opinion is completely contrary to Valles v. Union Pac. R. Co., 72 Idaho 231, at page 238, 238 P.2d 1154, 1159, where it was held the concurring negligence of two or more persons may be held as the proximate cause of the injury and—

> "* * * The rule derived from the following cases is that negligence, contributory negligence, and proximate cause are questions for the jury unless the proof is so clear that different minds cannot reasonably draw different conclusions or where all reasonable minds would construe the facts and circumstances of the case in only one way."

Herein the majority has, it is true, plausibly analyzed the evidence and concluded this analysis does not justify the jury considering the leak came from the valves of the tank. The pivotal question is whether the evidence sustains the verdict, not whether it would sustain some other theory. The nine members of the jury who signed the verdict thought it did and while it is true the Court may determine whether there is sufficient evidence to justify the verdict of the jury, the nine jurors reached a different conclusion and there is no contention they were not properly instructed and that they were not fair and reasonable, and as aptly stated in Hobbs v. Union Pacific R. R. Co., 62 Idaho 58, at page 72, 108 P.2d 841, 848, the best way to get a just determination of a disputed question is to submit it to a jury and get the benefit of the combined opinion of twelve persons:

> "'The method of deciding disputed facts, or of drawing just conclusions from those not in dispute, by submitting the question to a jury, composed of individuals of various walks of life, ages and experiences, is the best known means of establishing the facts which, in the administration of justice, must form the basis of a judgment.'"

The majority overlooks the absolute distinction between absence of evidence and analysis of the evidence and factual conclusions to be drawn therefrom. The majority says that where the verdict rests

upon circumstances, the circumstances must be clear and explicit and nothing left to conjecture. The majority opinion states the tank had been filled 100 times and nothing untoward had occurred. By the same token, the stoves and inside piping had been used every day the restaurant was open—more than a hundred days—and nothing had happened. This time the tank was filled by another than the regular and skilled operator and a devastating explosion occurred. The valve at the tank was leaking immediately after the explosion. The force of the explosion was similar to that detailed in Doxstater v. Northwest Cities Gas Co., supra, wherein there was less damage in the basement, where concededly the escaping gas was, than in the upper part of the house. How can it justifiably be said conclusively, as a matter of law, that this situation fails to factually justify the jury in pointing the finger of guilt unswervingly and unerringly at the tank and its lethal location?

The employee of the Butane Company who filled the tank, not the regular employee, did testify gas was not spilled at the tank. The valve on the tank was leaking when it was found later by a disinterested witness and the jury had the right to take into consideration this tank attendant was an employee of one of the co-defendants and credibility of the witness is for the jury.

The majority opinion further states: "The evidence on this point [that is, knowledge on the part of the owner or his duty to investigate or determine the presence of the gas tank] is fairly susceptible of only one construction, and that is that he knew of and consented to the installation and use of gas by his tenants":

The word "installation" runs all through respondents' brief and to some extent is in the evidence. It is perfectly apparent, however, from the context that such reference to "installation" is inaccurate and completely misleading to refer only to "installation". Appellant knew the restaurant operators were going to use gas and gas equipment was to be and was installed, but there is absolutely no evidence he knew where the tank was to be or was placed. At the most it was for the jury, not this Court to make the evaluation.

Kenneth C. Baird, the manager of the Butane Company, who made the arrangements with the Chinese operating the restaurant for their use of gas and secured the permit from the City and appellant, testified:

> "Q. Do you know whether Mr. Splinter ever knew where you put the tank? Did you ever tell him? A. I never told him."

Previous to that time he had, without definite and explicit statement as to the owner's knowledge of the position of this tank, thus testified:

"Q. Now, before you ever started to install this tank you went to Mr. Splinter and got his permission, didn't you? A. That's correct.

"Q. You and Mr. Fong went to Mr. Splinter and got permission from him to install this butane tank. A. Kim Fong.

"Q. Both of you? A. Uh huh."

That is not testimony that Mr. Splinter gave permission to put this tank where it was placed and the jury was justified in so considering. Mr. Splinter testified thus:

"Q. Now, that butane tank was installed in such a way that the end of the tank, the end with the valves on it, the intake valves, came right out into this opening that you had to put coal into your basement, didn't it? A. *That's the way it was found to be.* (Emphasis ours.)

"Q. Anyone walking by there, looking at that opening, or walking down the alley, could plainly see the end of that tank with valves attached to it, couldn't they? A. No. they couldn't not if they kept it closed, because it had a lid on top.

"Q. You kept a lid on top. A. There was a lid on top. Whether they kept it closed, I don't know.

"Q. But you don't know if that lid was ever kept on top of it. A. I never saw it open whenever I came through the alley.

"Q. You came through that alley frequently? A. Not too frequently, no. Not very frequently.

"Q. You never made any inspection of your own business, your own building, to see where that butane was being stored or how it was stored, or whether it was in the building? A. I had no reason to inspect it.

"Q. I asked you if you did. A. No, I didn't."

The jury had a right to believe Mr. Splinter, that he didn't have actual knowledge. It is true that Baird further testified:

"Q. Put it this way. What was the conversation you had with Mr. Splinter, you and the Fongs had with Mr. Splinter? A. Well, I don't remember the exact wording of it. We went up to get permission from Mr. Splinter to convert his equipment over and install this new gas range that Kim had already purchased.

"Q. Did you ask him permission—was that before or after you had permission from the City of Nampa? A. This was before.

"Q. Did you tell him where you were going to put the tank or did you have any conversation with him about the storage of butane gas? A. I

don't remember the conversation, *but it's very probable that he would ask.* (Emphasis ours.)

"Q. But you don't remember? A. No."

This was a bare conclusion which the jury had the right to completely disregard and, furthermore, Baird testified:

"Q. At the time you talked to Mr. Splinter isn't it a fact that you were going to place the tank behind the McLane Building? A. There hadn't been any decision at the time. We were just asking permission to do it.

"Q. Where were you going to place the tank at that time? A. There hadn't been any decision made at the time."

If there had been no decision, it does not show even by implication that Baird at that time told Mr. Splinter the tank was to be put where it was, in the coal chute. The testimony immediately following completely bears out the thought that Baird's testimony was not of such a nature as to render the verdict of the jury unsupported by the evidence on the point appellant did not know where the tank was placed:

"Q. When did you make up your mind that you wanted to put it behind the McLane Building? A. After we got permission from Mr. Splinter to make the installation.

"Q. Did you ask Mr. Splinter for permission to place the tank behind his building? A. No, not explicitly.

"Q. Did John Griffith ask him, to your knowledge? A. No, not to my knowledge.

"Q. Do you know whether Mr. Splinter ever knew where you put the tank? Did you ever tell him? A. I never told him."

As to what appellant should have known, the court properly instructed the jury as follows:

"You are instructed that a plaintiff should not be held to have been guilty of contributory negligence if it appears that he had no knowledge or means of knowledge of the danger, and conversely, he should be held guilty of contributory negligence if it is shown that he knew or reasonably should have known of the peril and might have avoided it by the exercise of ordinary care.

"You are further instructed that a plaintiff's knowledge of the physical characteristics of the offending instrumentality or condition does not in itself constitute contributory negligence. It is the appreciation of, or the opportunity to appreciate, the peril in an instrumentality or condition rather than the knowledge of its physical characteristics that may bar a plaintiff of recovery for negligence."

Undoubtedly the owner's knowledge or what he should have known under this instruction was a question for the jury. Respondents argue, however, that he knew as much as the City did. Baird testified positively that the tank was placed where it was in the alley back of the building with the valves protruding into the coal chute at the express direction of the City Engineer after the City, by resolution introduced in evidence, (Moved by Robinson and seconded by Kinney that the aforesaid request—Company's request to furnish gas to the restaurant and use its streets—be granted, provided the tank be buried under the direction of the City Engineer.) had authorized the installation under the direction of the City Engineer:

"Q. Then what happened? After you were permitted to install the tank, what did you do? A. Well, the next day we met with the city engineer, and was informed where to install the tank.

"Q. Who was the city engineer? A. John Griffith.

"Q. When did you meet with him? A. I went down to his office.

"Q. His office in the city hall of Nampa? A. Yes.

"Q. Then what did you do? A. Well, he and I went down to the Forbidden Palace.

"Q. What conversation did you have with him there, if any? A.

Well, there was a discussion of whether—where to install the tank, and the decision made with him where I was to put it, and the installation was started.

"Q. Did you make any suggestion as to where to place this tank? A. Yes. I had a place in mind where I wanted to put it.

"Q. Did you show him that place? A. Yes.

"Q. What did he say about it? A. No, he didn't want me to install it there.

"Q. What was his reason? Did he give you any? A. Well, it involved digging up part of the alley to bury the underground pipe.

"Q. Then did he fix a location for you to locate the tank or site for the tank? A. Yes, he told me to bury it underneath the ground, back of the building."

* * * * * *

"Q. * * * Now, as a matter of fact, you didn't tell John Griffith why you considered that an unsafe installation, did you? A. Yes.

"Q. Did you tell him why it was unsafe? A. Two reasons.

"Q. I know what your reasons were, but did you express those reasons to him? A. I did.

"Q. But you never mentioned them to anyone else. A. No.

"Q. Now, as I understand your reasons, it was on account of the propensity of butane gas when it vaporizes to seek a low level, is that right? A. That's right.

*  *  *  *  *  *

"Q. I believe you said Mr. Griffith wasn't even there until you sent for him when you ran into some pipes, some underground pipes. A. He was there when it was decided where to put the tank.

"Q. But after deciding on the place, Mr. Griffith went his way, and didn't come back until you hit these underground pipes. A. That's correct.

"Q. Then he came back and told you what to do with them. A. Yes."

The implication in the opinion seems to be that because only the City Engineer, so far as the City was concerned, knew exactly where this tank was placed, the City was absolved from liability. While what the Mayor testified to or what his attitude of mind was, did not necessarily determine the liability of the City, it is interesting to notice his attitude and what the jury might have thought reflected the attitude of the council with regard to the City Engineer in this respect:

"Q. Now then, as a member of the city council and mayor of the city, Mr. Honstead, weren't you concerned with the safety of the persons and property that might be involved in connection with burying that tank in an alley of the City of Nampa? A. Well, I think those are left to the charge of the engineer and somebody responsible for it.

"Q. You were leaving that entirely to the city engineer? A. And the butane people. It isn't uncommon to bury gas tanks, and permission was given to—for burying gasoline tanks in the parking on city property where it was necessary and as demanded by the owner.

"Q. You were leaving that up to the city engineer and the American Butane Company. A. As far as the butane company, yes, I think the butane company was—they were in the service and I understand they had been servicing buildings. I didn't know of any danger or hazard.

"Q. You were leaving that up to them. A. That would be the natural procedure, wouldn't it?"

The Mayor, so far as the record shows, left this matter entirely to the City Engineer and the City Engineer told the Butane Company to bury the tank at the place they did, after the manager of the Butane Company told the engineer that place was unsafe and hazardous. While there is no question that different minds might draw different factual conclusions from the evidence in the record, the record does not justify the conclusion the majority makes, that there is not sufficient evidence to show

that both the City and the Company were negligent in placing the tank where they did and it was for the jury to determine from all the facts and circumstances whether this negligent and improper location was one of the efficient causes, though coupled with other acts of negligence, which resulted in the destruction of the building.

Therefore, I dissent.

PORTER, C. J., concurs in this dissent.

On Petition for Rehearing.

TAYLOR, Justice.

 As basis for a rehearing appellant contends that the majority opinion "overlooks and abrogates the decisions of Idaho and the universal rule" that "a motion for judgment notwithstanding the verdict admits the truth of adversary's evidence and every inference of fact which may be legitimately drawn therefrom." Hendrix v. City of Twin Falls, 54 Idaho 130, 29 P.2d 352; Hobson v. Security State Bank, 56 Idaho 601, 57 P.2d 685. Trial "court should not take the case from the jury unless, as a matter of law, no recovery could be had upon any view which properly could be taken of the evidence." Evans v. Davidson, 58 Idaho 600, 77 P.2d 661, 667. "Where the evidence on material facts is conflicting, or where on undisputed facts reasonable and fair-minded men may differ as to the inferences and conclusions to be drawn, or where different conclusions might reasonably be reached by different minds, the question of negligence is one of fact to be submitted to the jury." Call v. City of Burley, 57 Idaho 58, 62 P.2d 101, 105; Byington v. Horton, 61 Idaho 389, 102 P.2d 652. Other earlier cases are also cited by petitioner. The rule, variously worded, has been repeatedly reaffirmed in more recent decisions. It was neither overlooked nor abrogated herein.

██ ██ A study of those cases reveals that where the negligence alleged rested upon circumstantial evidence, the circumstances relied upon were established by direct evidence, and were not themselves left to presumption or inference. It must be born in mind that this is not a case for the application of the doctrine of res ipsa loquitur. The city had no control over the maintenance or operation of either the tank, or any of the fittings or appliances in the building. The weakness of appellant's case is the want of evidence to establish a causal connection between the location of the tank and the explosion otherwise than by speculation and conjecture. The law requires some substantial evidence that the negligence alleged was the proximate cause of the injury. Clark v. Chrisop, 72 Idaho 340, 241 P.2d 171.

Rehearing denied.

THOMAS and KEETON, JJ., concur.

PORTER, C. J., and GIVENS, J., dissent.