388 P.2d 89

Jack B. DENT, Administrator of the
Estate of Harry M. Williams, De-
ceased, Plaintiff-Respondent,

v.

HARDWARE MUTUAL CASUALTY CO.,
a Corporation, Defendant-Appellant.

No. 9248.

Supreme Court of Idaho.

Dec. 20, 1963.

Rehearing Denied Jan. 22, 1964.

428

McDevitt & McDevitt, Pocatello, for appellant.

Albaugh, Bloem, Smith & Pike, Idaho Falls, for respondent.

McFADDEN, Justice.

Respondent Dent, as the administrator of the estate of Harry M. Williams, deceased, instituted this action against appellant Hardware Mutual Casualty Co., to recover on an automobile insurance policy issued Dr. Williams which contained, as one of its insuring agreements, the following:

"[The company agrees] To pay the principal sum stated in the policy declarations [$10,000] in the event of the death of the insured which shall result directly and independently of all other causes from bodily injury caused by accident and sustained by the insured while in * * * an automobile * *."

The policy also declared that the insurance did not apply "to loss caused by or resulting from disease * * *."

The jury empanelled to try the cause found for the respondent, and this appeal

was perfected from the judgment entered on the verdict.

On November 7, 1960, at about 11:30 A.M., Dr. Williams, a retired veterinarian of the age of 75 years, was found in an unconscious condition, still sitting in his car. His head was slumped over the steering wheel, and there was evidence of some bleeding from his nose and mouth. The condition of the right front portion of his automobile, and the condition of a bridge railing, indicated that his vehicle had struck the right hand railing of the small bridge, on Highway 28 across Birch Creek. He was removed from the vehicle, and taken by ambulance to a hospital in Idaho Falls.

While in the hospital emergency room, the reception nurse, perceiving difficulty in his breathing, called Dr. Hatch, a physician and surgeon, from surgery. Dr. Hatch, describing his condition, stated: " * * * He was obviously about to die. At least, he was suffocating, strangling, because his oxygen mechanism was being obstructed and his lungs and throat were full of mucus." Dr. Hatch rendered emergency treatment to give freer exchange of air, and resorted to an emergency tracheotomy, but without success, and Dr. Williams expired within a few minutes.

Dr. Williams death certificate, signed by Dr. Hatch showed:

"I. Disease or condition directly leading to death     (a) Cerebral Hemorrhage

ANTECEDENT CAUSES

Morbid conditions, if any, giving rise to the above cause (a)   DUE TO (b) _____

stating the underlying cause last   DUE TO (c) _____

II. OTHER SIGNIFICANT CONDITIONS

Conditions contributing to the death but not related to the disease or condition causing death.                    Accident, head injury."

The contentions of the respective parties are diametrically opposed insofar as an evaluation of the evidence is concerned. It is respondent's contention throughout this cause, both in the trial court and in this court that the evidence supports the jury's verdict in that it shows the cerebral hemorrhage leading to Dr. Williams' death was caused by the accident of the car striking the bridge. Contra to that position, appellant urged in the trial court, and urges here that the record shows that Dr. Williams' death came about from natural causes, and that the accident of the striking of the

bridge was caused by the cerebral hemorrhage—that Dr. Williams had sustained his cerebral hemorrhage prior to the time the car struck the bridge. Respondent urges that under his theory he has established the necessary facts to entitle him to recovery under the policy. Appellant, on the other hand, by appropriate assignments of error, challenges such conclusions and urges there is insufficient evidence to sustain the verdict and the judgment.

Respondent admits that there is no direct evidence as to why the car ran into the bridge. He contends however there was a violent collision, major in its impact, and evidence of blows to Dr. Williams' head. To support his contention he points to testimony of Mr. and Mrs. McCune, and to the testimony of Dr. Hatch, all of whom observed bleeding from the nose and mouth of Dr. Williams, and also points to the fact that the car was damaged to the extent repairs would cost $351.00. It is contended there was sufficient circumstantial evidence to lead to the conclusion that Dr. Williams had not suffered the disabling cerebral hemorrhage at the time of the accident, arguing if such had been the fact the car would have gone wildly out of control before striking the bridge.

No one witnessed the accident itself, and there were no tire marks, skid marks, or other direct or objective evidence that would give support to either party's contentions.

Respondent and appellant joined in the presentation of the evidence of Dr. Giddings, a pathologist, who performed a post-mortem autopsy upon the body of Dr. Williams. Generally the testimony of Dr. Giddings dealt with his findings and conclusions as recited in his autopsy report admitted into evidence.

Dr. Giddings, in his autopsy report, stated:

"FINAL DIAGNOSIS:

"1. Massive left cerebral hemorrhage associated with marked cerebral arteriosclerosis. (1300 grams).

"2. Severe coronary arteriosclerosis associated with cardiac hyperthrophy and terminal congestive heart failure (450 grams).

"3. * * *

"6. Superficial abrasions of the face and chest.

* * *

"COMMENT:

"The findings reveal that death was due to massive cerebral hemorrhage without specific evidence of trauma. This is associated with a heart strain due to extensive coronary arteriosclerosis and cardiac hy-

pertrophy. There is probably a terminal congestive heart failure with death occurring rather suddenly (within the matter of 1 or 2 hours)."

He testified that he found no evidence of hemorrhage due to external force, violence or trauma, and that in his opinion that the massive cerebral hemorrhage he described was due to hardening of the arteries and not to trauma.

The testimony of Dr. Hatch, the surgeon in attendance on Dr. Williams in the emergency room of the hospital, is the most favorable to the respondent of all the medical testimony. Dr. Hatch, however, while taking exception to certain findings of Dr. Giddings in his autopsy report, agreed that there was massive cerebral hemorrhage, but asserted there was evidence of trauma. He also felt that the actual mechanism of Dr. Williams' death was strangulation, although he would agree that the cerebral hemorrhage may well have been the major factor in his death. In answer to a question, hypothetical in nature, as to his opinion of the probable cause of the brain damage revealed by the autopsy, Dr. Hatch testified:

"I don't really think we know. I think we jump to conclusions—we come to conclusions, mainly, I think, because we wonder why he ran into the bridge. But I think that comes to your mind. But whether this blood vessel broke before he ran into the bridge or whether it broke afterwards, I don't think we know from this sort of a picture, because you could get the same effects from either one of them. I would say this, that I feel it is presumptious to say you know that it did happen before he ran into the bridge. I think that the picture that I saw, he well could have run into the bridge before-hand because he did have—he was bleeding, he had signs of injury, but as to whether this hemorrhage—and it could happen and it would be a reasonable expectation in a man of this age group who had hardening of the arteries, to have an injury, for it to break. But whether this happened before or after he hit the bridge, I think you are a little presumptious to be able to say that you are sure that that's what happened. I don't think we know. I would say it would be reasonable to presume that the blood vessel broke after he hit the bridge. It could well have done."

Dr. Hatch further stated:

"* * * It is apparent, with the facts that I have obtained in this case, that the man evidently became unconscious very suddenly and completely, and I think it would be very reasonable to assume that the trauma played a role in the picture—the injury. In other

words, the injury may have played a role in it."

On cross-examination:

"Q. Now, Doctor, you have made the statement that it was rational and lucid to find that this man, traveling along this highway, struck the bridge and that caused—set in motion, we will put it—the fact that caused the cerebral hemorrhage and caused his death. I believe you stated that that was within common medical reasoning and so forth, or words to that effect?

"A. That's my opinion.

"Q. Well, wouldn't it be equally proper to state that a man well acquainted with the road, travelling down the highway in plain daylight, without any possible outside influence that we can ascertain whatsoever, would not strike the bridge unless he had suffered some previous involvement?

"A. Well, you said equally possible?

"Q. Yes.

"A. That's a hypothetical question. You mean applied to him?

"Q. Yes, as applied to this man.

"A. I would say yes, that that is a possibility that this could have happened before he went, and that because of the stroke he could have driven into the bridge.

"Q. And it is equally probable and equally possible, medically, that that is the way it did happen, is it not Doctor?

"A. Well, it's my opinion that the other is a little more likely because of these other conditions."

■ Under the terms of this policy, it is incumbent upon the plaintiff to establish by substantial and competent evidence:

1. That the insured was dead.

2. That his death resulted directly from bodily injury.

3. That the bodily injury was caused by accident, while decedent was in an automobile.

■ This court under the provisions of I.C. § 13–219, and its numerous decisions applying that statutory provision, cannot set aside a verdict where there is substantial evidence to support it. Inherent in this statutory mandate and rule of law, however, is the obligation to carefully and precisely examine a record to determine whether there is "substantial evidence to support a verdict", and in case of failure in that regard to set such verdict aside.

This court has stated in McMaster v. Warner, 44 Idaho 544, 552, 258 P. 547, 549.

"* * * It might be said that, on account of the scar described by Dr. Erskine and others, a suspicion might arise that she might have been affected

with and operated on for lump jaw before the sale. This reasoning is unsound for the rule has been repeatedly announced in this state that every party to a law action has a right to insist upon a verdict or finding based upon the law and the evidence in the case and not, in the absence of evidence, upon mere inference or conjecture. Hargis v. Paulsen, 30 Idaho 571, 166 P. 264; Antler v. Cox, 27 Idaho 517, 149 P. 731; Holt v. Spokane [etc.] R. Co., 4 Idaho 443, 40 P. 56."

In Splinter v. City of Nampa, 74 Idaho 1, 10, 256 P.2d 215, 220, in discussing the question of the sufficiency of the record to sustain a judgment for plaintiff in a negligence action, the majority opinion stated in language appropriate to the issues here:

"Circumstantial evidence is competent to establish negligence and proximate cause. Facts, which are essential to a liability for negligence, may be inferred from circumstances which are established by evidence. But, where circumstantial evidence is relied upon, the circumstances must be proved, and not themselves be left to presumption or inference. (Citations.) This court has held that inference cannot be based upon inference, nor presumption on presumption. (Citations.)

"The underlying principle applicable here is that a verdict cannot rest on conjecture; that where a party seeks to establish a liability by circumstantial evidence, he must establish circumstances of such nature and so related to each other that his theory of liability is the more reasonable conclusion to be drawn therefrom; and that where the proven facts are equally consistent with the absence, as with the existence, of negligence on the part of defendant, the plaintiff has not carried the burden of proof and cannot recover. (Citations).

"Where it remains equally probable from a consideration of all of the evidence, that the injury resulted from the cause suggested by the defendant, as from that suggested by the plaintiff, the plaintiff has not established his case."

See also: Annot.: 95 A.L.R., subd. III, pp. 181–192; Wigmore on Evidence, Third Edition, (1940) Vol. IX, pg. 299.

In Antler v. Cox, 27 Idaho 517, 149 P. 731, this court dealing with a state of facts involving sufficiency of proof as to which of two causes occasioned an injury, quoted from Searles v. Manhattan Ry. Co., 101 N.Y. 661, 5 N.E. 66, in language applicable here:

" 'When the fact is that the damages claimed in an action were occasioned by one of two causes, for one of which the defendant is responsible, and for the other of which it is not responsible, the plaintiff must fail if his evidence does not show that the damages were produced by the former cause, and he must fail, also, if it is just as probable that they were caused by the one as by the other, as the plaintiff is bound to make out his case by the preponderance of evidence. The jury must not be left to mere conjecture, and a bare possibility that the damages were caused in consequence of the negligence and unskillfulness of the defendant is not sufficient.' "

In Tulsa County Truck & Fruit G. Ass'n v. McMurphey, 185 Okl. 132, 90 P.2d 927–929 (1939), the Supreme Court of Oklahoma stated:

" * * * However, in order to support a verdict for the plaintiff, circumstantial evidence must be sufficient to render the fact or conclusion sought to be established more probable than one or more other conclusions which would be inconsistent with liability. Wigmore on Evidence, Second Edition, vol. 1, page 253. Otherwise the decision would be said to rest on speculation and conjecture. As we said in paragraph two of the syllabus in Phillips Petroleum Co. et al. v. Davis et al., 182 Okl. 397, 77 P.2d 1147: 'A verdict returned against a defendant upon circumstantial evidence must be said to be based on speculation and conjecture when, after considering all the evidence, together with inferences to be reasonably drawn therefrom, all unprejudiced minds must agree that any one of several conclusions consistent with nonliability of defendant may as reasonably be drawn therefrom as conclusions of liability under plaintiff's theory of the case.' "

In the instant case, even the respondent's most favorable medical expert recognized that either one or two conclusions could as reasonably be drawn from the facts present. While he stated on direct examination that " * * * it would be reasonable to presume that the blood vessel broke after he hit the bridge," he immediately qualified this statement in continuation of his answer to the question propounded, that "It [the blood vessel] could well have done." On further direct examination in answer to a question of whether he thought it more probable that the trauma and blow would rupture the blood vessel or that it would rupture just while driving along, the doctor stated: " * * * it would be very reasonable to assume that the trauma played a role in · * * * the injury." Again he imme-

diately qualified this statement in continuation of his answer when he said: "In other words, the injury may have played a role in it." These statements of the doctor dealing with probabilities were in each instance immediately qualified by him to the realm of possibilities. His statement on cross-examination to the effect that: "* * * it's my opinion that the other is a little more likely because of these other conditions," is indicative of only a weighing of possibilities, not an affirmative statement of a probability in his opinion. Nowhere does the record indicate evidence of probative value pointing to Dr. Williams' death as being caused by accident, as opposed to his death resulting from natural causes. Under such a state of the record, this cause must be reversed.

Judgment reversed and cause remanded with directions to dismiss the action.

Costs to appellant.

TAYLOR and SMITH, JJ., concur.

KNUDSON, Chief Justice, with whom McQUADE, Justice, concurs (dissenting).

The majority opinion in this case correctly quotes the rule that a party in a law action has a right to insist upon a verdict or finding based upon the law and the evidence in the case and not, in the absence of evidence, upon mere inference or conjecture. The opinion also refers to decisions of this court and I.C. § 13–219, wherein it is stated that "whenever there is substantial evidence to support a verdict the same shall not be set aside."

We disagree with the conclusion reached in the majority opinion wherein it states that the respondent did not submit sufficient competent evidence to sustain the verdict. Without attempting to call attention to all the evidence tending to establish respondent's theory of the case attention is called to the following evidence submitted;

That the deceased (Dr. Williams) left the home of Mr. Hutchings at about 9:30 a. m. after being detained an hour or more on account of fog conditions; that he ate a good breakfast and was very jovial before leaving; after traveling 25 miles the right front end of his automobile struck the bridge abutment on the right-hand side of the highway with such force that the right front wheel and fender "were pushed under the car" resulting in damage repair cost amounting to $351.00.

At approximately 11:00 o'clock a. m. Dr. Williams was found alone in his car at the scene of the accident, his automobile partly over the side of the bridge at a point approximately two-thirds of the distance across the bridge. He was found with his head

on the steering wheel in a comatose condition; one side of his face was discolored, his face was extensively bruised and was bleeding from his mouth and nose. He was shortly thereafter taken to the hospital where Dr. Hatch, the only doctor who attended him after the accident, found him in a critical condition, his face swollen, bleeding from the nose and mouth, with abrasions and bruises on his face. Dr. Hatch was in attendance until he died a short time later from a cerebral hemorrhage. Dr. Hatch signed the death certificate in which it is stated that the accident and head injury was a condition contributing to the death. Furthermore the doctor testified positively it was his opinion that striking the bridge was the fact which caused the cerebral hemorrhage resulting in the death; such opinion is clearly stated in the first question and answer quoted in the majority opinion under "On Cross-examination."

We do not agree with the statement contained in the majority opinion relative to Dr. Hatch's testimony that "These statements of the doctor dealing with probabilities were in each instance immediately qualified by him to the realm of possibilities." To us it is clear that Dr. Hatch consistently held to his opinion that the accident caused the hemorrhage and that such opinion was well "within common medical reasoning."

It is true that other witnesses expressed different opinions as to the time and cause of the hemorrhage, and there were conflicts as concerns other evidence. Dr. Giddings, as an expert, expressed his opinion as to the cause of death and effects of the happenings immediately preceding the death, based his opinion upon an autopsy performed by him after Dr. Williams had been dead and embalmed for the period of five days. The testimony of Dr. Giddings was introduced by deposition. In this connection we consider it significant to call attention to the following answer given by Dr. Giddings who performed the autopsy. When asked if he had any way of showing how long the hemorrhage occurred prior to Dr. Williams' death, his answer was:

"A I think it is difficult in this case. As I mentioned, this body had been embalmed five days, and then the autopsy was ordered. We always like— for complete evaluation we like to examine the body prior to embalming. I think we can be much more dogmatic in our statements under those conditions."

Dr. Giddings acknowledged that he did not find or examine the specific leakage point in Dr. Williams' brain where the hemorrhage occurred. When asked "were you able to ascertain how rapidly the hem-

orrhage had come on, that is the accumulation, had it been sudden, or over a gradual period, were you able to find that out?" he stated, "I could not answer that question." As an expert he further testified that "where there is gradual seeping these patients complain of intense headache, and they usually consult a doctor, or tell friends or relatives or something that 'this is such a severe headache I cant stand it any longer.'" However, without having any information whatever relative to Dr. Williams' health history Dr. Giddings and Dr. Barnard, who based his opinion solely upon the autopsy report, expressed the opinion that the hemorrhage preceded the car accident.

In contradiction to such opinions Dr. Hatch, in expressing his opinion as to when the hemorrhage occurred, stated:

"* * * I would say this, that I feel it is presumptious to say you know that it did happen before he ran into the bridge. I think that the picture that I saw, he well could have run into the bridge before-hand because he did have—he was bleeding, he had signs of injury, * * *"

"* * * It is apparent, with the facts that I have obtained in this case, that the man evidently became unconscious very suddenly and completely, and I think it would be very reasonable to assume that the trauma played a role in the picture—the injury." * * *

It cannot be said that Dr. Hatch was not well qualified and competent to give his opinion as an expert. In fact his qualifications were admitted. The jury was fully instructed regarding the elements which determined the value of an expert opinion and they were instructed to give expert opinions such weight and value as they believed to be right and proper under the circumstances.

Evidence was introduced by respondent regarding weather and ground conditions in the area where the accident happened. A research meteorologist, quoting weather records made for the National Reactor Testing Station, testified that such records disclosed that at 8:00 o'clock a. m. on the day of the accident, in that area, "there was glaze, light on the ground and exposed objects." When asked what was meant by "glaze" he replied:

"A Glaze is formed from precipitation at the surface—if the surface of the ground is much cooler than the area above it, so if it is raining, as the rain falls it falls on these cold objects and so immediately becomes ice. We call it glaze. It was reported light on the ground and exposed objects.

"Q All right, you may go ahead. That was at 8:00 o'clock?

"A That was at 8:00 o'clock. * * *"

He further testified that at the same time and place the temperature was 25 degrees and at 10:00 a. m. it was 29 degrees; that during the entire morning the humidity remained at 100%. It will also be remembered that fog conditions delayed Dr. Williams for more than an hour in starting his trip and that throughout the distance between where he started and where he had the accident it was "uphill all the way."

Under these circumstances we believe that it was purely a question for the jury to determine the facts from the conflicting testimony of all the witnesses and from all the evidence adduced at the trial arrive at a verdict. Evidently the jury concluded that the opinion of Dr. Hatch and the evidence submitted in support of respondent's case was the more reasonable conclusion to be drawn from the circumstances established. We are convinced that there was circumstantial evidence from which the jury could conclude that weather or road conditions caused the accident and that the trauma and excitement that he experienced resulting from the accident caused the hemorrhage producing his death. It is not the privilege of this court to weigh and evaluate the testimony of each witness— that was the province of the jury. The judgment of the lower court should be sustained.